Marcus Sayre and The Marcus Sayre Company, complainants and respondents,

*v.*

The Mayor and Common Council of the City of Newark, and The Board of Street and Water Commissioners of The City of Newark, defendants and appellants.

[Filed March 19th, 1900.]

1. The legislature of this state has constitutional power to confer on municipalities the right to use the tidal streams within our borders as outlets for public sewers carrying off surplus water and the sewage from buildings.

2. The charter of the city of Newark grants to the municipal authorities of the city the right to use the Passaic river as such an outlet.

3. The fact that such a use of the Passaic river pollutes the water and air in the neighborhood of a dock on the river owned by private persons, and thus lessens the value of the private property, will not justify an injunction to restrain the city from constructing and operating a sewer, which the municipal authorities have, within the limits of their legal discretion, determined to be necessary for sewerage purposes.

Marcus Sayre Co. *v.* Newark.

1. The title to a tidal stream below ordinary high tide is in the state as absolute owner. A riparian owner has no property in the land under tidal waters by reason of his adjacency thereto. The inchoate right of the owner of the upland to acquire an exclusive right to the property by wharfing out or otherwise improving gives him no property in the land while it remains under water. Per Depue, J.

2. But by the local common law of this state a riparian owner may erect a wharf, dock or other improvement into a tidal stream, and by such improvement will acquire a property, and his title to such portion thus reclaimed becomes vested and indefeasible, except so far as it, in common with all other property, is subject to the state's eminent domain. Per Depue, J.

3. The title of the riparian owner which was under discussion in *Stevens* v. *Newark and Paterson Railroad Co.*, 5 *Vr.* 532, was that of a riparian owner who had neither wharfed out nor otherwise improved his connection with the tidal stream, and consequently had no property rights to be affected by the execution of the public grant then in question. Hence, it was held by the court that the public domain was subject altogether to the control of the legislature, and that incidental damages resulting to individuals from the exercise of such control gave no legal claim to compensation. In *Beseman* v. *Pennsylvania Railroad Co.*, 21 *Vr.* 235, which was a suit by an owner of property adjacent to the track of a railroad, alleging injury from the use of the company's track for the passage of its locomotives and cars in the transportation of cattle, &c., so as to render his dwelling-house unfit for habitation, &c., the charter of the railroad company being pleaded, it was held that the franchises granted to the company legalized the running of trains and the transportation of freight, and the acts complained of being themselves lawful, those incidental injuries which necessarily and unavoidably resulted from the exercise of legislative authority, if prosecuted in all respects with care and skill, were *damnum absque injuria.* Per Depue, J.

4. The charter of the city of Newark conferred on the city the right to use the Passaic river as an outlet for its sewers. On a bill filed by the owner of land on the Passaic, which had been improved by the erection of a wharf and dock used for receiving and shipping materials in the conduct of his business—*Held*, (1) that the use of the Passaic river by the city as an outlet for its sewers being lawful, such incidental injuries as necessarily and unavoidably result from the exercise of such legislative authority are *damnum absque injuria*, but that the city is liable in damages for an injury resulting to such riparian owner caused by negligence in the construction and management of its sewers; (2) that for the purpose of determining what acts of a city in the construction and use of its sewers into tidal waters by legislative authority are or are not actionable, the distinction is between the duties of a municipality which are of a *quasi* judicial nature, involving the exercise of judgment and discretion, and ministerial duties, such as the construction and repair of sewers; with respect to the former no action is maintainable, and an action is given only for negligence in performing such duties as are ministerial. Per Depue, J.

On appeal from a decree advised by Vice-Chancellor Reed, whose opinion is reported in *13 Dick. Ch. Rep. 136.*

*Mr. Joseph Coult,* for the appellants.

*Mr. Thomas N. McCarter, Jr.,* and *Mr. Robert H. McCarter,* for the respondents.

. The opinion of the court was delivered by

DIXON, J.

The complainant Marcus Sayre is the owner, and The Marcus Sayre Company is the lessee, of land having a frontage of about two hundred feet on the west side of the Passaic river in the city of Newark, where they carry on the business of buying and selling mason's materials. At that point, and for several miles above the city, the tide ebbs and flows in the river, and the river is navigable for vessels of considerable size; consequently the state was the owner of the bed of the river below ordinary high-water mark; but in pursuance of an implied license from the state growing out of the local common law of New Jersey, as declared in *Bell* v. *Gough, 3 Zab. 624,* and *Stevens* v. *Paterson and Newark Railroad Co., 5 Vr. 532,* the complainant owning the upland had built a dock in front thereof and thus had acquired title to so much of the shore as was occupied by the dock.

The object of the bill of complaint is to restrain the city of Newark from completing and using a public sewer now in process of construction and designed to empty its contents into the Passaic river below low-water mark and about fifty-six feet north of the complainants' property. The ground of objection is that the sewage discharged from the sewer will be carried by the tide to the complainants' property and will so infect the water and air in the neighborhood as to impair the comfort and health of persons engaged on the premises and thus lessen the value of the property.

The sewer in question is designed to be an auxiliary in the city's plan of sewerage. Experience has shown that in times of

heavy rain the existing sewers are inadequate to carry off the
water and sewage that seek passage through them, and hence the
filthy material is backed up into the streets and cellars of con-
nected buildings. The object of the new sewer is mainly to
receive this surplus and conduct it to the river, and the evidence
in the cause shows that the city authorities have exercised their
discretion in planning the sewer and are constructing it with
care for the accomplishment of that purpose.

We are thus brought to the controlling questions in the case—
*first,* whether the legislature has intended to authorize the city
to construct and use such a sewer; *second,* whether the legislature
has constitutional power to grant such authority; and *third,*
whether the complainants, as private owners of property likely
to sustain some incidental damage from the operation of the
sewer, are entitled to have the city restrained from exercising
the authority conferred.

As to the first question, by the original charter of Newark
as a city, passed February 29th, 1836 (*P. L. of 1836 p. 185*), the
common council was empowered to pass all such ordinances
as they should deem proper for regulating the streets and caus-
ing common sewers and drains to be made in any part of the
city. By a supplement to the charter passed February 28th,
1838 (*P. L. of 1838 p. 218*), "the mayor and common council of
the city, to enable them more fully, effectually and completely
to exercise the powers already conferred on them of passing all
such ordinances as they shall think proper and of raising and
borrowing money for causing common sewers and drains to be
made in any part of the city," were authorized and empowered
to take and appropriate to the use of the city all such lands,
waters and streams within and adjacent to the said city as
might be suitable or necessary to drain and carry off the water
from the streets, lanes, alleys and grounds in the city. This
act makes provision for compensation to the owners of property
taken.

By another supplement approved February 28th, 1849 (*P. L.
of 1849 p. 203*), the city was empowered to cause the expense of
building sewers to be assessed, in whole or in part, on the
owners of property benefited. This plainly contemplates the

construction of common sewers for the benefit of private property.

By an act to revise and amend the charter of the city, approved March 11th, 1857 (*P. L. of 1857 p. 116*), these provisions were re-enacted so far as they relate to the regulation of streets, the construction of sewers and the assessment of the expense thereof on property benefited; and nothing therein contained was to impair or take away any right acquired or given by any former act. This statute also expressly empowered the council to provide for the protection and maintenance of the health of the city.

By a supplement to this act, approved March 19th, 1857 (*P. L. of 1857 p. 301*), the authority of the city to construct the sewer in the first and second wards of the city, commonly known as the "north sewer," is distinctly asserted by the legislature. This sewer was built to drain private property as well as streets, and empties into the Passaic river.

A further supplement approved March 26th, 1872 (*P. L. of 1872 p. 828*), expressly recognizes the authority of the city to construct sewers in the public streets for the draining of private property lying along the streets.

The evidence in this case shows that at least as early as 1854 the municipality constructed common sewers through the streets, having their final outlet in the Passaic river, to carry off, not only the water and refuse in the streets, but also the sewage from private property; and from that time to the present this power has been continually exercised.

In *Stoudinger* v. *Newark, 1 Stew. Eq. 187* (*1877*), a bill was filed to prevent the city from constructing what is known as the Mill brook sewer, which ran from High street through various streets to the Passaic river, and was intended to conduct into the river the foul waters of the Mill brook, and the sewage of the streets and houses along its course. But Vice-Chancellor Van Fleet decided that the city had power to build the sewer and held that the location of sewers, their size and capacity, and the materials of which they should be constructed, were matters which, by the charter, were committed to the judgment of the municipal authorities, and so long as they kept within

their power and did not abuse it, their acts were not subject to judicial revision. The order of the court of chancery denying an injunction was affirmed by this court (*1 Stew. Eq. 446*), with a declaration that it was not only the right, but the duty of the municipal authorities to erect and maintain all necessary sewers.

In view of this course of public conduct on the part of the city, of this series of legislative enactments, and of these judicial utterances, we are impelled to the conclusion that the legislature has intended to confer upon the city of Newark the right to use the Passaic river as an outlet for such sewers as the municipal authorities deem necessary for removing the surplus water and sewage of the city and its inhabitants.

The next question is whether the legislature has the constitutional power to confer such a right.

In *Stevens* v. *Paterson and Newark Railroad Co., 5 Vr. 532,* Chief-Justice Beasley, expressing the opinion of this court that the legislature had the power to grant lands in a navigable river below high-water mark, without regard to the owner of the adjacent upland, declared "that all navigable waters within the territorial limits of the state, and the soil under such waters, belong in actual propriety to the public; that the riparian owner, by the common law, has no peculiar rights in this public domain, as incidents of his estate; * * * that, as a general rule, the public domain is subject altogether to the control of the legislature; * * * that, unless in certain particulars protected by the federal constitution, the public rights in navigable rivers can, to any extent, be modified or absolutely destroyed by statute; * * * that the dominion of the legislature over the *jura publica* appears to be unlimited. By this power they can be regulated, abridged or vacated."

These explicit declarations of the judgment of this court seem to place beyond question the power of the legislature to authorize the municipalities of the state to use the tidal navigable streams within our borders for sewerage purposes. The federal constitution interposes no obstacle to the exercise of such a power, provided the availability of the stream for interstate and foreign commerce be not impaired; and as no private

property exists in such waters, there remain only the *jura publica*, over which, in the words of the chief-justice, the dominion of the legislature appears to be unlimited. Indeed the history of sewers shows that from time immemorial the right to connect them with navigable streams has been regarded as part of the *jus publicum*. Although in England, until modern times, sewers were used chiefly to drain low lands liable to be submerged by tide and rain and the streets of towns, yet in other countries for centuries past, and more recently in England and the United States, they have been constructed to carry off the sewage of dwellings; and whenever tidal streams could conveniently be reached, they have been employed as the medium of discharge to the sea. Such a use of public waters must necessarily entail some defilement; the degree of pollution to be permitted is a matter over which the legislature has full power of control.

It therefore seems clear that in New Jersey the legislature may constitutionally confer on the municipalities of the state the right to use tidal streams for sewerage purposes, and that in the proposed construction and operation of the sewer now in question, the city of Newark is within the limits of its delegated authority.

The last point for consideration is whether the complainants may restrain the exercise of this authority, because of the incidental damage which it will cause to them and their property.

The principle laid down by the supreme court in *Beseman* v. *Pennsylvania Railroad Co., 21 Vr. 235,* and approved by this court in *23 Vr. 221,* disposes of this phase of the controversy. That principle is, that, if a corporation, though private, in the reasonable exercise of a franchise lawfully granted to it for a public purpose, causes an incidental damage to private property, such damage is *damnum absque injuria*. The principle thus enunciated is applicable *a fortiori* to a public corporation. The same doctrine was declared with reference to tidal streams in *Stevens* v. *Paterson and Newark Railroad Co., ubi supra,* where the chief-justice said that "as a general rule, the public domain is subject altogether to the control of the legislature, and that

incidental damage resulting to individuals from the exercise of such control, gives no legal claim to compensation."

We have, therefore, the city of Newark, a public corporation, executing within the bounds of its discretion and with care a franchise lawfully granted to it by the legislature for a public purpose, but thereby producing consequential damage to the complainants. Such damage is a loss for which there is no remedy; it is a burden to which the sufferers must submit as members of the community from which they receive compensatory benefits.

There are decisions in the courts of this state to the effect that even negligence on the part of a public corporation in the performance of a public function, whether *quasi* judicial or ministerial, will not justify an action for damages against the corporation on behalf of a person who has sustained special damage by reason of such neglect. The exact purport of these decisions, and whether consistently with them the aggrieved party might not seek relief by injunction or *mandamus,* under circumstances otherwise appropriate to those means of redress, we need not now consider, for there is neither allegation nor proof of such negligence in the present case.

Our conclusion is that the intended action of the city is lawful, and therefore the injunction issued out of chancery should be dissolved and the bill dismissed.

DEPUE, J.

The Passaic river at Newark is a tidal stream. The ebb and flow of the ordinary tide at the Centre street bridge, near which the mouth of the proposed sewer is located, is four feet and nine inches. The river empties into Newark bay four and a half miles below the bridge. The tides extend above the city to the Dundee dam, about eight miles above the bridge and six miles above the city line. As far up the river as Newark the river is navigable with steamboats and vessels engaged in the sea-going trade with almost every port in the United States on the Atlantic coast. Above the city the river is navigable with steamboats and vessels of considerable size as far as the Dundee dam. Between the city and the Dundee dam the federal government has at

Marcus Sayre Co. *v.* Newark.

times expended considerable sums of money in removing reefs and obstructions and otherwise improving that part of the river for navigation.

Besides the city of Newark, with its population of two hundred and fifty thousand inhabitants, and Paterson, with its population of one hundred thousand—cities with large manufacturing establishments, discharging waste into sewers and sometimes directly into the stream—the sewage of Passaic, Rutherford, Montclair, Orange, East Orange, Belleville, Arlington, Kearny, East Newark and Harrison is carried into the river. With such a mass of sewage cast into the river the waters of the stream have become polluted and foul.

But this is not a suit by the attorney-general *ex-officio* for the purpose of vindicating or protecting any public right. The complainants are the owners of a lot of land in the city, having a frontage on the river of two hundred and fifty feet, on which there has been erected a wharf and dock. The premises are used for the brick, lime, cement and masons' materials business. A large part of the materials used in the business is brought there by boats and scows, and there are employed daily upon the premises from thirteen to twenty-five men, engaged in the business of the company. The outlet of the proposed sewer in the stream is just above the Centre street bridge, fifty-five feet north of the northerly line of the complainant's property. The suit is for the prevention of injury to private property anticipated by the construction of the proposed sewer. It presents at the threshold a consideration of the rights of the state and of a riparian owner who has improved his connection with tide water.

The title to a tidal stream below ordinary high tide is in the state as absolute owner. The decision of this court in *Stevens* v. *Newark and Paterson Railroad Co., 5 Vr..532, 550,* placed the law of this subject on a firm foundation as a finality. In that case Chief-Justice Beasley, in delivering the opinion of the court, said: "As a general rule, the public domain is subject altogether to the control of the legislature, and incidental damage resulting to individuals from the exercise of such control gives no legal claim to compensation. The principle seems universally conceded that, unless in certain particulars protected by the federal

24

constitution, the public rights in navigable rivers can, to any extent, be modified or absolutely destroyed by statute. * * * The dominion of the legislature over the *jura publica* appears to be unlimited." This decision was made in a case where the riparian owner had neither wharfed out nor otherwise improved his connection with the tidal stream, and consequently had no property rights to be affected by the execution of the public grant then in question. How far the doctrine contained in this extract from the chief-justice's opinion in its universality will be modified by the fact that in the present case the complainants have constructed a dock on the property in question will hereafter be discussed.

In fresh-water streams the property in the bed of the stream is in private ownership, with a usufruct as private property, subject to certain public rights. From an early period in England the right of drainage and sewerage was regarded as a public right, and was regulated by statute as early as Henry VI. *5 Chit. Burn. J. 993; 5 Com. Dig., tit. "Sewers," 453, 465.* In England and in this country power to construct and utilize sewers in private streams has frequently been granted by act of parliament or act of the legislature. The right to devote a private stream to the purposes which are to a certain extent public uses is founded on the common-law right of the upper proprietors. In streams of this class the right of upper proprietors is limited to the reasonable use of common property. *Higgins* v. *Flemington Water Co., 9 Stew. Eq. 538, 543.* "In tidal streams, although the king has the property, the people have likewise the use necessary. *Rex habet proprietum sed populus habet usum ibidem necessarium."* *Call. S. 13; Hall R. Cr. 14.* A right conferred by the state to use its property for sewer purposes is without limitations and qualifications that attach to the use of private property for those purposes.

By the charter of the city of Newark and the supplements thereto the legislature empowered the city to construct sewers so as to discharge into the Passaic. By the act of 1891, the power of the common council in this respect was transferred to the board of street and water commissioners. The location of the proposed sewer and its connection with the river for the

purpose of discharging sewage therein were lawful acts, under competent municipal authority, and a legitimate exercise by the city of a right conferred by the legislature. The decision of this case must rest, therefore, on the legal rules established for determining the liability for damages to a riparian owner arising from the exercise of legislative authority for such use of a tidal stream, and the conditions under which the exercise of that right will afford redress to a riparian owner who has improved his connection with tidal waters for an injury to his property.

Cases cited by the vice-chancellor, such as *Attorney-General* v. *Leeds, L. R. 5 Ch. 583; Same* v. *Birmingham, 4 Kay & J. 528,* are instances where the sewerage of a town was into small brooks and the pollution was inevitable, and the property affected was private property. It will also be observed that in such cases the right of sewerage was under statutes which, as will appear by the *Leeds Case,* conferred the right to use the stream on condition that no nuisance was created. The cases cited from the courts of our own country, of which *Chapman* v. *Rochester, 110 N. Y. 273; Nolan* v. *New Britain, 69 Conn. 668,* and *Hayes* v. *Dwight, 150 Ill. 273,* are types, are also cases of drainage into small streams. In these cases the waters affected were private waters, and the appropriation of them for public sewerage far exceeded the reasonable use, such as determines the rights of upper and lower proprietors on private streams, and the injury was such as amounted to a palpable invasion of private property, and justifiable only under the right of eminent domain on just compensation. *Trenton Water Power Co.* v. *Raff, 7 Vr. 335; Nolan* v. *New Britain, supra. Seifert* v. *Brooklyn, 101 N. Y. 136,* was an action for damages caused by the insufficiency of the sewerage system to carry off the sewage, whereby it was forced through a manhole and inundated the plaintiff's premises. Cases coming under the above classifications are inapplicable to this litigation. These are the decisions on which the vice-chancellor rests his judgment. They cannot rule this case, for the reason that the right of sewerage into private waters rests upon principles different from those which prevail where the sewerage is into public waters.

By the law of this state a riparian owner has no property in

the land by reason of his adjacency to tidal waters while it remains under water. The inchoate right which the owner of the upland has to acquire an exclusive right to the property by wharfing out or otherwise improving the same gives him no property in the land while it remains under water. *State* v. *Jersey City, 1 Dutch. 525; Slewart* v. *Fitch & Boynton, 2 Vr. 18.* Such was the title under discussion in *Stevens* v. *Newark and Paterson Railroad Co., supra,* to which the expression of the chief-justice, that incidental damages resulting to individuals from the exercise of legislative control gives no legal claim to compensation, was applied. At common law the right of the owner of lands along the shore of tidal waters extended only to ordinary high water, but in this state such owner may extend his improvements by wharves and other improvements to the low water. Such was declared to be the law in this state before the adoption of any of the statutes regulating riparian rights, and is attributed to what has been called local usage or local common law. But by the common law of England and the local common law of this state, the owner of riparian lands acquires a property in his reclamations by wharfing out or otherwise improving, and the state cannot appropriate the shore so recovered to public use without adequate compensation. Consequently, for any invasion of his property or use of it without lawful authority such owner is entitled to the same remedies as the owner of property is entitled to under the general law of the state. Among the rights of a riparian owner who has made his improvements between high and low-water mark is the right to the use of his wharf and of access to the navigable waters. In *Lyon* v. *The Fishmongers Co., L. R. 1 App. Cas. 662, 671,* decided in the house of lords, and considered, not only in England, but in this country, as the leading authority on the subject of the right at common law of a riparian owner who has improved and wharfed out on the bank of the stream, Lord Cairns used this language: "Unquestionably the owner of a wharf on the river bank has, like every other subject of the realm, the right of navigating the river as one of the public. This, however, is not a right coming to him *qua* owner or occupier of any lands on the bank, nor is it a right which, *per se,* he

·enjoys in a manner different from any other member· of the public. But when this right of navigation is connected with .an exclusive access to and from a particular wharf, it assumes .a very different character. It ceases to be a right held in common with the rest of the public, for other members of the public have no access to or from the river at the particular place; and it becomes a form of enjoyment of the land, and of the river in ·connection with the land, the disturbance of which may be vindi-·cated in damages by an action, or restrained by an injunction."

This doctrine of the common law in this respect has been .affirmed as the law of this state. In *Gough* v. *Bell, 2 Zab. 441,* which established the law of this state as a finality, the action was in trespass *quare clausum fregit.* The defendant pleaded *liberum tenementum.* The plaintiff made title under a deed from the heirs of Coles for the upland adjoining Harsimus cove .above high water. Coles acquired title in 1804, and was the undisputed owner of the soil bounded by the river. The defend-ant made title under a survey by the proprietors of East Jersey to Boudinot, dated May 21st, 1802, for fifty-three and one-half acres of land then lying entirely .below ordinary high water ·on Harsimus bay. Boudinot, January 2d, 1804, conveyed to Budd in fee the same lands. November 8th, 1836, an act ·of the legislature was passed vesting in Budd all the right .and title of the state of New Jersey to the lands which had been surveyed to Boudinot, and conveyed to him by Boudinot. *P. L. of 1836 p. 13.* The grant of the state to Budd was for lands entirely under water, and the right of the state to make ·such a grant, independently of considerations hereafter men-·tioned, was undisputed. The question was whether the title so granted was valid as against the Coles title. It appeared in the case that as early as 1814 or 1815 Coles commenced the erec-tion of a wharf extending from his .own land towards the chan-·nel of the river, a distance of over one thousand feet, which was ·completed before the passage of the act of 1836. He· also re-claimed a part of the· mud flats in front of his land, lying between high and low water, by filling in with earth and rais-ing them above the level of the tide. At the time of the passage ·of the act the place where the trespass was committed was not

subject to the flow and reflow of the tide. It was admitted, as was stated by Chief-Justice Green, that within the boundaries of the grant the legislature had power to make it, and the question for decision was whether the title to the *locus in quo* was in the state at the time of the passage of the act. After an exhaustive examination of prior decisions of this state, the chief-justice expressed his conclusions that "the title of the state extends, as at common law, to high-water mark, but it is to high-water mark as it actually exists. Where the waters have receded by alluvion, or by the labor of the adjoining proprietor, the title of the state does not extend beyond the actual high-water line. That any encroachment upon the shore or other part of the public domain may at all times be restricted and controlled by legislation is admitted. That any erection prejudicial to the common rights of navigation or fishery may be abated is not denied. But, in the absence of such legislative restriction, where no nuisance is created, the riparian proprietor may appropriate the shore between high and low-water mark to his own use." He adds: "The custom of making such appropriation, long enjoyed and universally acquiesced in, constitutes a local common law, which this court will recognize, and which it would be alike unsafe and unwise to disregard." The chief-justice then expressed his opinion, which was concurred in by the court, that the act of 1836 did and could convey to Budd no title to the soil from which the flow and reflow of the tide had been excluded by the improvements of the riparian owners at the time of the passage of the act, and judgment was given for the plaintiff. The judgment of the supreme court was affirmed in the court of errors and appeals, and by these decisions the law was settled in this state that if the owner of land bounded by the shore upon tide water make improvements upon or reclaim the shore adjoining his lands, the part of the shore so improved or reclaimed belongs to him and cannot be granted by the state. *Gough* v. *Bell, 3 Zab. 624.*

In a subsequent case, Chief-Justice Green, in referring to the decision of *Gough* v. *Bell,* used this language: "By the common law of this state wharves erected by the shore owner below tide, and within the limits of the *jus publicum,* vest in the shore

owner. It was so held by all the court in *Gough* v. *Bell.* The judges, it is true, differed as to the foundation and nature of the right of the shore owner, but all agreed that when the land was reclaimed or the wharf erected by the tacit or express consent of the legislature, it became private property, and divested of its public character. And the owner has the same absolute dominion over it, the same exclusive right of enjoyment in it, that he has in and over private property." *O'Neill* v. *Annett, 3 Dutch. 290, 293.* In *Keyport Steamboat Co.* v. *Farmers' Transportation Co., 3 C. E. Gr. 511, 516,* Chief-Justice Beasley, delivering the opinion of this court, used this language: "It has already been conclusively settled by judicial decisions in this state that after such landowner has reclaimed from the dominion of the water the land along his front, even beyond low-water mark, his title to such portion thus reclaimed becomes vested and indefeasible, except so far as it, in common with all other property, is subject to the state's eminent domain." And in the *Stevens Case, 5 Vr. 545,* Chief-Justice Beasley, referring to *Gough* v. *Bell,* remarked that the final decision in that case was a concurrence in the views expressed by Chief-Justice Green in his opinion delivered in the supreme court, and he declared that the existence and legality of the usage which conferred on the riparian owner the right to extend his lands by artificial means below the line of high water was *res adjudicata* in this state. Property in a wharf or dock on a navigable stream consists in the ability of the owner to use the structure in connection with the navigable water.

The problem for solution, then, is the consideration of the scope of the legislative authority granted to the city to connect its sewers with the Passaic, in respect to the rights of a riparian owner who has improved and acquired a property in his improvements by reclaiming and wharfing out. I am unwilling to assent, even *sub silentio,* to the proposition that under our law the city of Newark may vent its sewage into the river *ad libitum,* to the destruction of wharves and docks on the Passaic of great value and of incalculable public benefit, without the owners of such property being entitled to a remedy by action or otherwise. Such, in my judgment, is not the law of this state.

The evidence in this case shows that the complainants have sustained a serious injury by the discharge of earth and sewage into the stream from the city sewer at Ballantine's dock, which was carried by the water to and in front of the complainants' dock; that the complainants' dock has thereby been filled up from year to year by the refuse coming down from the sewer, so that occasionally the dock had to be dredged out. The gravamen of the complaint in this bill is the apprehension of the same or greater injury in that respect by the opening of the proposed sewer nearer to their property. The injury complained of and apprehended is purely an injury to private property, in which the public is in no sense concerned. For such an injury done without legislative sanction an action will lie.

The city justifies under the power conferred on it by the legislature. The issue in this case presents the construction and effect of the powers granted by the legislature to the city for the use of the Passaic for sewerage, with respect to injuries sustained by the owners of improved riparian property, for which, without competent legislative authority, an action or injunction might be maintained. The legal rules that control where an injury to private property is occasioned in the course of the exercise of legislative authority were adjudged in *Beseman* v. *Pennsylvania Railroad Co., 21 Vr. 235;* affirmed in this court, *23 Vr. 221.* The suit was brought by an owner of property adjacent to the tracks of the company's railroad, alleging an injury from the use of the company's track for the passage of locomotives and cars in the transportation of cattle, sheep, swine, manure and other freight, so as to render his dwelling-houses unfit for habitation, and that it wrongfully allowed its cars loaded with such freight, both in the daytime and at all hours of the night, to stand upon said track, emitting noisome odors, &c., and shifted and distributed its cars, and blew the whistles of its locomotives, and causing great and unusual noises, &c., and jarring the doors and walls of said dwelling-houses, &c., whereby, &c. To the declaration the defendant pleaded its chartered right to build a railroad, and that it used the same in the prosecution of its business as a common carrier of passengers and freight, as it lawfully might do, and did thereby

necessarily create some smell and some noise, and did necessarily shift and distribute its cars, and did necessarily transport thereon cattle, sheep, swine, manure and other freight, as it lawfully might do, without that, &c. This plea was demurred to, and the chief-justice, in sustaining the plea, placed his opinion on the stable ground that the franchises granted to the defendant legalized the running of trains and the transportation of freight by the company, and the acts complained of being themselves lawful, those incidental injuries which necessarily and unavoidably resulted from the exercise of legislative authority, if prosecuted in all respects with care and skill, were *damnum absque injuria*. It will be observed that the chief-justice in the decision of this case qualifies the doctrine on which the *Stevens Case* was decided, and limited the immunity of such public body from liability for damages resulting to individuals from the exercise of legislative control to those incidental injuries which necessarily and unavoidably result from the exercise of legislative authority, and added a condition that the franchises granted should be exercised with due care and skill. The difference in this respect between the decisions in the two cases was eminently proper. In the first case the chief-justice was dealing with the right of a riparian owner who had acquired no property by improving his connection with the tidal stream, and in the other case the injury was to an owner of adjacent lands whose property was affected in the exercise of public franchises under legislative authority.

The doctrine adjudged in the *Beseman Case* accords with the decisions of the English courts. *Vaughn* v. *Taff Vale Railway Co., 5 Hurlst. & N. 679; Hammersmith Railway Co.* v. *Brand, L. R. 4 H. L. 171; L., B. and S. C. Railway Co.* v. *Truman, L. R. 11 App. Cas. 45.* In these cases the injuries, the subject of suit, were such as resulted from the operation of railways under legislative authority, and it was held that an action would not lie for damage necessarily resulting from the exercise of the powers of an act of parliament; that a cause of action could arise only from negligence in the execution of the statutory powers.

These decisions were made upon statutory powers granted to

private corporations in the exercise of public franchises for their own emolument.  The legal rule thus established has greater support in reason and in public policy with respect to municipal bodies upon which devolve the ·duty of providing sewers for the health and comfort of the inhabitants.  It was applied to the construction and operation of a sewer built and managed by a public body under statutory authority, and held that as it was a public body acting in the discharge of a public duty, and as that which happened was only the inevitable result of what parliament had authorized them to do, they were not liable. *Dixon* v. *Metropolitan Board of Works, L. R. 7 Q. B. D. 418.* In *Geddis* v. *Proprietors of Bann Reservoir, 3 App. Cas. 430, 435,* the defendants were incorporated by statute to make and maintain by means of a reservoir a constant water-supply for owners of mills situate on the river Bann.  To do this they had power to collect waters into a reservoir, from which water was from time to time to be sent down to the river through a channel in a stream called Muddock, and they had power to maintain, widen, deepen and cleanse proper channels and water courses, &c.  The plaintiff's property was injured by flooding as the result of the defendants permitting to pour down through the channel of the Muddock more water than it would hold.  In the house of lords it was held that the plaintiff was entitled to recover an action for damages, on the ground that the defendants, having power to widen and deepen the channel of the Muddock sufficiently to contain the water, were bound to do so before sending the water down.  Lord Blackburn, in his opinion, states the principle in these words: "It is now thoroughly well established that no action will lie for doing that which the legislature has authorized, if it be done without negligence, although it does occasion damage to any one; but an action does lie for doing that which the legislature has authorized, if it be done negligently.  And I think that if by a reasonable exercise of the powers either given by statute to the promoters, or which they have at common law, the damage could be prevented, it is, within this rule, 'negligence' not to make such reasonable exercise of their powers."

The principle adjudged in the *Beseman Case* was applied by

the supreme court of the United States under circumstances identical with those in this case. *City of Boston* v. *Lecraw, 17 How. 426, 437; Richardson* v. *City of Boston, 19 How. 263, 270.* These two decisions were upon the same facts and in relation to the same property. The city had power by statute to construct its sewers into tide water, and the owner had erected a wharf on adjoining property. The first case was by the tenant in possession, the other by the owner. In the first case it was held that an injury to the wharf arising from the construction of the sewer into tide water was *damnum absque injuria,* but in the second case it was held that if the drain constructed by the city was not carried out sufficiently to discharge its contents so as to be swept off by the tides, but caused an accumulation of matter at the outer end of the plaintiff's wharves, in so much that vessels could not approach with the same depth of water as formerly, that was an injury to the plaintiff, for which he was entitled to recover.

The use of the Passaic river by the city as an outlet for its sewers being lawful, such incidental injuries as necessarily and unavoidably result from the exercise of such legislative authority are *damnum absque injuria,* but for injuries arising from negligence, the city, being without the protection of legislative authority, is responsible therefor to the owners of improved riparian property. For it will be observed that the legal rule which exempts public bodies from liability to pay damages for injuries to private property applies only to those incidental injuries which necessarily and unavoidably result from the exercise of the legislative authority.

The city justifies under the power contained in its charter. In its answer it describes the construction and use of the proposed sewer as the best plan that could be devised by ventilation and otherwise, to prevent the venting of fermented and foul sewage into the river—the location and use of the sewer, &c., &c., &c., with great particularity. The answer of the city to the bill of complaint as a justification conforms in principle to the plea in the *Beseman Case.* These averments present an issue for decision in this case; in fact, the real issue on which this litigation should be disposed of. An answer justifying under

the city charter, which authorized the city to connect its sewers with the Passaic, without such averments as are contained in this answer, with respect to the location, construction and use of this sewer, would have been imperfect and would be struck out. And on the testimony taken prominence was given to evidence explanatory of the location, mode of construction and adaptability of the proposed sewer to lessen the injury to private property that might be affected by the sewerage. By the evidence it appears that the sewer proposed to be constructed by the city is four thousand three hundred and forty-seven feet in length, with an opening into the Passaic six feet in diameter, and extending below low-water mark. It extends into sewer districts numbers five and six of the city. District number five embraces an area of two hundred and twenty-three acres, and the sewer now in that district is discharged into the Passaic at Ballantine's dock, two hundred and fifty-four feet north of the complainants' property. District number six embraces five hundred and sixty-two acres, and the sewer now in that district is discharged through Market street into the Passaic at the city dock, two thousand feet south of the complainants' property. Into the proposed sewer will drain two hundred and ninety-five acres in a thickly populated portion of the city, having a population estimated at twenty thousand. The necessity for this sewer arises from the fact that the sewerage in these two districts has become inadequate because of the increase of storm water, and a nuisance was created by the overflow of the sewers in times of heavy rains, lifting off the covers of the manholes and discharging sewage into the streets and flooding the cellars. The proposed sewer was designed as a means of relief. Upon the construction of this sewer it is not proposed to dispense with the sewers that are now in existence in these districts. The sewer begins in Arlington street, near the Market street sewer, crosses sewers that are connected with the sewer system emptying into the Passaic at the city dock and at Ballantine's dock, and is designed to carry off storm water, which might accumulate at the time of severe rains. Necessarily it would take up some part of the house sewage. Otherwise than relieving that portion of the city that was flooded at times of severe rains from the over-

flow of water, the proposed sewer did not increase the sewage carried into the river by the sewers already in existence. The separation of the fluids in sewage from the solid matter appears to be a step in the right direction. The plan for construction provides for ventilated manholes every two hundred feet for the purpose of relieving the sewer from the evolved gases and the delivery of the sewage at the mouth of the sewer, as far as possible, in an unfermented state. This method of constructing sewers is of recent adoption. The testimony of the witnesses, who are experts on the subject, makes it clear that a sewer constructed with such ventilation as the sewage proceeds from the intake to the outlet will relieve the outlet in a great measure from the foul gases usually discharged. Mr. Schaeffer, a witness called by the complainants, says that perforated covers placed over the manholes would prevent decomposition by admitting fresh air and causing the interior of the sewer to be kept cooler and less liable to be in a condition for decomposition to take place; therefore the sewage would be deposited at the outlet more freely in its natural state. Dr. Disbrow testifies:

"There is no danger from sewerage poison if the sewage is active. As long as it flows with plenty of ventilation there is no danger whatever. If the ventilation were every two hundred feet, enough oxygen would be supplied to dilute the gas sufficiently for its complete oxidation or burning up, and would be the only scientific way to construct a sewer. If it were so constructed there could not be at the point of discharge any obnoxious odors or gases that would be injurious or affect any one."

Dr. Wallace says:

"The sewer is to be constructed with perforated manholes. With these, any gases which might arise through decomposition would be liberated. There would not be much smell at point of discharge. Gas would not be liberated if the discharge was below the surface of the river, as it would if it dropped down into the river."

Ernest Adams says: "The perforated tops in sewers help to create a current of air and are considered to be the only method, or one of the best methods, to ventilate sewers." It is a fair deduction from the evidence, with respect to ventilation in the course of the sewer, that the emission of foul gases in the other

sewers, such as that at Ballantine's dock and the city dock sewer, was probably due to the fact that the sewage was not subjected to the ventilating process in its passage to the river.

For the purpose of determining what acts of a city in the construction and use of its sewers are or are not actionable, the distinction is between the duties of a municipality which are judicial or *quasi* judicial and those which are ministerial. With respect to the former, no action is maintainable, and a remedy by action is given only for negligence in performing such duties as are ministerial. In *Atwood* v. *City of Bangor, 83 Me. 582* the action was to recover damages for the unlawful location, construction and maintenance of a sewer below low-water mark in the Penobscot river, whereby the plaintiff's dock was rendered less valuable by reason of the liability of vessels to ground on the end of the sewer and on the sediment flowing out of it. It was held by the court that the city had a right to extend its sewer across the flats of the river to a point below low-water mark; that in the performance of its duty to the public in locating sewers for the drainage of the city the city council acted judicially, and for that judicial act the city was under no common-law liability; but if the construction was improperly and unskillfully made it was a ministerial act, for which the city might be made liable to any party injured thereby. The same distinction between the duties of municipal authorities with respect to acts that are of a *quasi* judicial nature, involving the exercise of judgment and discretion and depending upon considerations affecting the public health and general convenience throughout an extensive territory, and ministerial duties, such as the construction and repair of sewers, was adopted in the supreme court of the United States in *Johnston* v. *District of Columbia, 118 U. S. 19.* To the same effect are *Morse* v. *City of Worcester, 139 Mass. 389; Child* v. *City of Boston, 4 Allen 41; Franklin Wharf Co.* v. *City of Portland, 67 Me. 46; Lynch* v. *Mayor of New York, 76 N. Y. 60,* and *Clark* v. *Peckham, 10 R. I. 35.*

The complainants have no cause of complaint that the outlet of this sewer is nearer their property than the sewers already in the river. The location of the outlet of a public sewer is neces-

sarily committed to the discretion of the public authorities. The proper place for such location is determined by public necessity and convenience, and the decision of the municipal authorities on this subject is conclusive, because it is the exercise of a discretion reposed in them by law and not reviewable by the courts. *Atwood* v. *City of Bangor, supra; Morse* v. *City of Worcester, supra; Lynch* v. *The Mayor, &c., supra; Stoudinger* v. *City of Newark, 1 Stew. Eq. 187.* This whole subject is considered and decided by the supreme court of Massachusetts in *Merrifield* v. *City of Worcester, 110 Mass. 216.* In that case the plaintiff was the owner of land abutting on a natural stream running through the city. He sued the city for the violation of his rights as riparian owner in polluting its waters so as to render them unfit for mechanical and other purposes. The drains and sewers were constructed by the city under authority conferred upon the common council by the city charter. The ground of liability was that dirt, filth and other materials were carried into the stream by means of these drains and sewers. It was held that the plaintiff could not recover against the city for the pollution, so far as it was attributable to the plan of sewerage adopted by the city, but that a recovery might be had so far as it was attributable to the improper construction or unreasonable use of the sewers, or to the negligence or other fault of the city in the care or management of them; that for the incidental disadvantage, loss or inconvenience necessarily resulting to individuals in their rights of property from the maintenance and use of the drains in a proper and reasonable manner, without negligence in their care and management, no action could be maintained; but in the construction of works so laid out, the town or city is responsible that it will be done in a proper manner and with a reasonable degree of skill and care; and if for want thereof any unnecessary injury is caused to the property or rights of individuals the town or city may be charged therewith. This case has been discredited as applied to private waters, where reasonable use is the measure of the right of the upper proprietor; but the doctrine of the case is abundantly supported upon principle and authority as to tidal streams, where the right of the public has been derived from the state

to use its property, and maladministration of the powers conferred is the condition of responsibility.

It must be assumed that the city in the exercise of its rights will make all reasonable efforts to avoid injury either to riparian owners or to the health and comfort of its inhabitants. If by the use of the river for sewers by the city or by other places along the river its condition has become such that such use should be prohibited or regulated, the subject devolves upon the legislature to prohibit or regulate as in its judgment may seem fit. In England, statutes regulating sewers and the use of streams for that purpose have been passed, some of which are referred to in *16 Eng. Rul. Cas. 413, 427, 619, 628.* From an early period in England a body known as commissioners of sewers has been in existence, with extensive powers and control over the subject. *5 Com. Dig. 453, &c., tit. "Sewers;" 6 Chit. Burn. J. 593.*

Under the law of the state the city has the right to construct this sewer, with an outlet into the Passaic river at such a point as the duly constituted authorities of the city in their judgment should adopt. If by reason of fault in the construction or management of the sewer injury to private property is sustained, redress may be had therefor by an action for damages, and injunction may become the appropriate remedy, but the evidence makes no case for an injunction *quia timet.*

For the reasons above given, I concur in the decision of this court reversing the decree of the court of chancery and dismissing the complainants' bill.

*For reversal*—The Chief-Justice, Depue, Dixon, Garrison, Gummere, Ludlow, Collins, Bogert, Hendrickson, Adams, Vredenburgh—11.