FREDERICK F. LOVEJOY *vs.* CITY OF NORWALK.

Third Judicial District, Bridgeport, April Term, 1930.

WHEELER, C. J., MALTBIE, HAINES, HINMAN and BANKS, Js.

Argued April 11th—decided November 7th, 1930.

*Nehemiah Candee* and *Homer S. Cummings,* with whom was *Raymond E. Hackett,* for the appellant (plaintiff).

*William H. Comley,* with whom, on the brief, was *Joseph R. Taylor,* for the appellee (defendant).

HINMAN, J. In the foregoing statement of facts regarded as essential to the discussion and result and in further mention of facts in the course of this opinion, we have embodied such requested corrections of the finding, as to such facts, as we find to be warranted. Such other facts as relate to conditions at and near the sewage outlets are of no controlling importance in the

present inquiry, which relates, essentially, to conditions at and over the plaintiff's oyster grounds, distant two miles or more from such outlets. The basis of the action is the allegation that the defendant has permitted sewage to be discharged upon the plaintiff's grounds, with injurious consequences to the oysters thereon and the usefulness and value of his plantations and business. The controlling conclusions reached by the trial court were: that the acts found were confined to tidal waters and did not constitute a public nuisance; that the plaintiff or his predecessors in title received their grants of oyster grounds subject to the public right of employing tidal waters for drainage purposes, and the exercise thereof by the defendant was not in derogation of any right of the plaintiff. As the effect of these conclusions, if sustained, is to defeat the plaintiff's claim for recovery of damages, those findings and requested corrections which pertain to the amount of plaintiff's damage are of no present materiality.

In 1916, the Virginia Supreme Court of Appeals considered a case (*Hampton* v. *Watson,* 119 Va. 95, 89 S. E. 81, L. R. A. 1916F, 189) the essential facts of which were substantially analogous to those here involved. It was an action against the city of Hampton to recover for damage to an oyster bed by pollution of the waters of Hampton creek—a large tidal navigable body of salt water, an arm of the sea—by sewers emptying therein. The plaintiff was in possession of certain oyster planting grounds under lease from the State. Hampton constructed its sewers in 1899-1900 and afterward extended the system. In 1914, after it was found, by investigations by health authorities, that the waters of Hampton creek were too polluted to permit the sale of oysters therefrom, the State department notified the plaintiff and other oyster planters that

they would not be permitted to sell their oysters without first transplanting them to unpolluted waters. The plaintiff sued for the consequent detriment to him.

On appeal by the defendant city from a judgment of the trial court in the plaintiff's favor, counsel for the plaintiff, in support of the contention that the city was liable, cited a number of cases in which recovery has been had for pollution of nonnavigable streams (including *Watson* v. *New Milford,* 72 Conn. 561, 45 Atl. 167, and *Platt Bros. & Co.* v. *Waterbury,* 72 Conn. 531, 45 Atl. 154). These cases were held not analogous. "There is, however, a marked and well-established distinction between the pollution of a small nonnavigable stream and the pollution of large tidal, navigable bodies of salt water, for the reason that in the first case the bed of the stream and the waters are owned by the riparian owners, while in the latter case it is well settled that the bed of the navigable, tidal salt water and the waters themselves are owned and controlled by the State, for the use and benefit of all the public, subject only to navigation. It is for the State to say what uses shall be made thereof and by whom, subject always to the right of the public, and for the State, through the legislative branch of the government, to say how much pollution it will permit to be emptied into and upon its waters, so long as the owners of the land between low-water and high-water mark are not injured. . . . From the early English decisions to the present time . . . it has been held that the tidal, navigable salt waters, and the beds thereof, belong to the Commonwealth, in a sovereign capacity, for the benefit of all the public, and cannot be disposed of to the detriment of the public interest. *Taylor* v. *Commonwealth,* 102 Va. [759], 768, 47 S. E. 875, 102 Am. St. Rep. 865; *Newport News Shipbuilding & Dry Dock Co.* v. *Jones,* 105 Va. 503, 54 S. E. 314, 6 L. R. A.

(N. S.) 247; *Illinois Central R. Co.* v. *Illinois,* 146 U. S. 387, 13 Sup. Ct. 110, 36 L. Ed. 1018; *Marcus Sayre Co.* v. *Newark,* 60 N. J. Eq. 361, 45 Atl. 985, 48 L. R. A. 722, 83 Am. St. Rep. 629; *Coxe* v. *State,* 144 N. Y. 396, 39 N. E. 400." *Hampton* v. *Watson, supra,* p. 98. After reviewing some of the authorities cited, the opinion proceeds as follows (pp. 100-103): "Since the State holds its tidal waters and the beds thereof for the benefit of all the public, we are of opinion that the city of Hampton has the right to use the waters of Hampton creek for the purpose of carrying off its refuse and sewage to the sea, so long as such use does not constitute a public nuisance and as such be discontinued by the legislature, which has control over the extent to which these waters may be so used. The sea is the natural outlet for all the impurities flowing from the land, and the public health demands that our large and rapidly growing sea coast cities should not be obstructed in their use of this outlet, except in the public interest. 'One great natural office of the sea and of all running waters is to carry off and dissipate, by their perpetual motion and currents, the impurities and offscourings of the land. The owner of any lands bordering upon the sea may lawfully throw refuse matter into it, provided he does not create a nuisance to others. And there can be no doubt that public bodies and officers, charged by law with the power and duty of constructing and maintaining sewers and drains for the benefit of the public health, have an equal right.' *Haskell* v. *New Bedford,* 108 Mass. 208, 214.

"In *Sayre* v. *Newark, supra* [p. 367], it is said: 'Indeed the history of sewers shows that from time immemorial the right to connect them with navigable streams has been regarded as part of the *jus publicum* . . . and whenever tidal streams could conveniently be reached, they have been employed as the medium

of discharge to the sea. Such a use of public waters must necessarily entail some defilement; the degree of pollution to be permitted is a matter over which the legislature has full power of control.' The State guards the health of its people for the benefit and protection of the public at large and under present sanitary standards, sewerage systems for all thickly settled communities have become an imperative necessity, a public right, which is superior to the leasing by the State of a few acres of oyster land, within the corporate limits of a city, to an individual at $1 per acre per annum. When the plaintiff leased this land he took it with full knowledge of the then-existing sewerage emptying into Hampton creek and subject to the public right to increase the same as necessity required, on account of the growth in population of the city of Hampton. In conclusion, we are of opinion, in the light of the authorities cited, that the defendant city was acting within its lawful right in emptying the sewerage complained of into the waters of Hampton creek, and that any injury occasioned the private oyster bed of the plaintiff thereby was *damnum absque injuria*."

In *Darling* v. *Newport News*, 123 Va. 14, 96 S. E. 307, decided by the State Supreme Court of Appeals in 1918, the plaintiff based its claim for relief upon allegations of fact similar to those found in *Hampton* v. *Watson*, and the lower court sustained a demurrer to the bill because of opinion that the latter case was controlling upon the main question involved. The appellate court concurred in that view, adopting as a fair statement of its conclusions, the syllabus of the *Watson* case, including the following: "2. A municipal corporation situated on an arm of the sea, adjacent to tidal waters, has the right to use such waters for the purpose of carrying off its refuse and sewage to the sea,

so long as such use does not create a public nuisance, and any injury occasioned thereby to private oyster beds is *damnum absque injuria.*" The opinion then discussed the construction of the lease and the extent of the plaintiff's rights thereunder, to which we later advert. The case was taken to the United States Supreme Court where it was decided in April, 1919 (249 U. S. 540, 39 Sup. Ct. 371, 63 L. Ed. 759), the opinion being by Justice Holmes. Taking up, first, the right of a State to authorize a municipality to discharge sewage into the sea, he says (p. 542): "The fundamental question as to the rights of holders of land under tide waters does not present the conflict of two vitally important interests that exists with regard to fresh water streams. There the needs of water supply and of drainage compete. *Missouri* v. *Illinois,* 200 U. S. 496, 521, 522 [26 Sup. Ct. 268]. The ocean hitherto has been treated as open to the discharge of sewage from the cities upon its shores. Whatever science may accomplish in the future we are not aware that it yet has discovered any generally accepted way of avoiding the practical necessity of so using the great natural purifying basin. Unless precluded by some right of a neighboring State, such as is not in question here, or by some act of its own, or of the United States, clearly a State may authorize a city to empty its drains into the sea. Such at least would be its power unless it should create a nuisance that so seriously interfered with private property as to infringe constitutional rights. And we apprehend that the mere ownership of a tract of land under the salt water would not be enough of itself to give a right to prevent the fouling of the water as supposed. The ownership of such land, as distinguished from the shore, would be subject to the natural uses of the water. So much may be accepted from the decisions in Virginia and elsewhere as

established law. *Hampton* v. *Watson,* 119 Va. 95 [89 S. E. 81]; *Haskell* v. *New Bedford,* 108 Mass. 208, 214; *Marcus Sayre Co.* v. *Newark,* 60 N. J. Eq. 361 [45 Atl. 985]; *Illinois Central R. Co.* v. *Illinois,* 146 U. S. 387, 459 [13 Sup. Ct. 110]."

The trial court in the present case, as appears from its memorandum of decision, regarded this decision as of controlling importance on this point, and, finding nothing in the facts sufficient to differentiate it, reached a conclusion accordingly. Counsel for the plaintiff, however, contend that the *Darling* case is inapplicable to the present situation and inquiry. One of the claimed points of distinction is that, since that decision, development of the science pertaining to the mechanical and chemical treatment and purification of sewage has been such as now to render unnecessary and unreasonable dependence upon or utilization of the natural diluting, purifying and dissipating facilities afforded by salt water and its ebb and flow with the tides for purposes of sewage disposal. The trial court was unable to find that any such development in the science of sewage disposal has occurred since the *Darling* case as to render obsolete or materially affect the applicability of the principle there laid down.

It fairly appears that such degree of efficiency as the finding attributes to a modern and complete disposal plant, properly operated, has been arrived at gradually and through research, experiment, and practical experience extending back at least twenty-five years. However, if we assume such a degree of efficiency and reliability as is indicated by the finding now to have been attained for plants of that kind to be sufficient to appreciably alter the situation in that respect in the *Darling* case, other considerations are relevant and material to a determination as to whether, as a matter of reasonable municipal administration, provision of

such a plant in substitution for sea-water purification is warranted or required. These include the degree of ineffectiveness of the latter means of disposal, the consequences to the public, or to individual rights, or both, and the cost of erection and expense of operation of such a plant and the financial resources available therefor. In the matter of time, also, there is to be considered the period necessary for proper investigation, preparation of plans, securing the requisite votes of authorization and the provision of funds, involving—in the present instance—enabling legislation. Special Acts of 1929, p. 758.

If the situation of the plaintiff now was such as to entitle him to relief from injury to his oysters resulting from pollution of the waters by sewage or damages for failure to accord it, the inquiry is pertinent when would the defendant city become liable to him? Under the *Darling* case, it would not have been liable in 1919. When, subsequently, if at all, did the science of purification reach such a point, and other considerations concur, as to render that case inapplicable? Obviously, on this record, no duty to change the method of sewage disposal—so far as concerns this plaintiff—arose, at the earliest, until refusal of certificates for harvesting his oysters (1927). In September of that year the city employed engineers to make a survey of the problem of sewage disposal; an exhaustive report was rendered in March, 1928; during the same year a proposal to procure funds by issuance of bonds and to proceed to build, was submitted to and approved by the voters, and at the time of the trial, November, 1928, it was the purpose, if legislative approval could be obtained, to proceed without delay to construct the plant. We think that this situation affords no indication that the defendant city had acted unreasonably, or negligently failed to take steps toward correction

of the conditions of which the plaintiff complains. *Winchell* v. *Waukesha,* 110 Wis. 101, 85 N. W. 668, and note, 84 Am. St. Rep. 909, 922.

The facts do not establish any actual destruction of or injury to the plaintiff's oysters by the deposit upon them of sewage filth or sludge, or other visible and offensive conditions, but are confined to the existence in the waters flowing over them of bacteria, invisible to the naked eye, varying greatly as to presence and numbers under different conditions, and affecting the marketability of the oysters only by the application of arbitrary standards, and then not because of the ascertained presence of disease or disease-producing elements but as a precautionary health measure. Commendable as this measure undoubtedly is, yet the plaintiff's situation in this respect squares substantially with those present in the Virginia cases, and in *Seaman* v. *New York,* 161 N. Y. Supp. 1002, and sharply differentiates those cases on which the plaintiff relies, where, as in *Huffmire* v. *Brooklyn,* 162 N. Y. 584, 57 N. E. 176, and *Bailey* v. *New York,* 78 N. Y. Supp. 210, the oysters were covered with noxious deposits and destroyed, and those which concerned nuisance-creating accumulations of filth at and about sewer outlets, as in *Franklin Wharf Co.* v. *Portland,* 67 Me. 46; *State* v. *Portland,* 74 Me. 268; *Haskell* v. *New Bedford,* 108 Mass. 208, and *Brayton* v. *Fall River,* 113 Mass. 218. It is to be noted, further, that it appears in the *Darling* case that *Huffmire* v. *Brooklyn* was relied on by the plaintiff therein as supporting his contention, but was not concurred in either by that State court or the United States Supreme Court.

Having determined, as above stated, the rights of a State to authorize the emptying of sewage into the sea, the courts, in *Darling* v. *Newport News,* considered the further question whether the State, in that instance,

had precluded itself from so authorizing, or curtailed the privilege, by its leases of oyster grounds to the plaintiff and others. As to this, the State court held (pp. 20, 21): "If it be true that the private right of the appellant to continue to use and occupy this territory for the planting of oysters has been so guaranteed by the State as to make his rights superior to the interest of the large public otherwise entitled (within proper limits), to use the waters of Hampton Roads for its sewage, then the burden is clearly upon him to show that this is true. . . . That the right claimed by the city clearly existed before the enactment of the oyster law cannot be doubted, and the legislature cannot be presumed to have intended to destroy this ancient and undoubted public right in the absence of a clear and explicit statute indicating such purpose. . . . Under the Virginia statute, then, as construed by this court, the oyster planter takes his right to plant and propagate oysters on the public domain of the Commonwealth in the tidal waters, subject to the ancient right of the riparian owners to drain the harmful refuse of the land into the sea, which is the sewer provided therefor by nature." As to this phase of the case, the opinion of the United States Supreme Court says: "We agree with the court below that when land is let under the water of Hampton Roads, even though let for oyster beds, the lessee must be held to take the risk of the pollution of the water. It cannot be supposed that for a dollar an acre, the rent mentioned in the Code, or whatever other sum the plaintiff paid, he acquired a property superior to that risk, or that by the mere making of a lease, the State contracted, if it could, against using its legislative power to sanction one of the very most important public uses of water already partly polluted, and in the vicinity of half a dozen cities and towns to which that water

obviously furnished the natural place of discharge." 249 U. S. 543, 39 Sup. Ct. 372.

A like conclusion follows as to the rights of the plaintiff in the present case unless, as is the second major claim on the part of the plaintiff, the situation presented by the facts here, and our statute law, is such as to require or warrant a construction of the designations upon which the plaintiff relies as conferring rights or privileges so much more comprehensive as to render the holdings in that case inapplicable..

The statutes under which these designations were made and in the light of which they are to be construed, originated as Chapter 92 of the Public Acts of 1855. This Act provided (§ 1) for the appointment, by a town, of a committee "to designate suitable places in the navigable waters of this state, lying within the limits of [the] town, for the planting of oysters in accordance with the provisions of this act." Section 2 provided that "any person desiring to plant oysters" may apply to this committee "to designate a suitable place to be used by such applicant for that purpose" and such committee may proceed to make such designation, provided no one person shall have set to him territory exceeding two acres in extent. Section 3 provided that "every person who shall plant oysters in any place so designated, marked out and inclosed, shall be and continue to be the owner of such oysters so planted as aforesaid, and shall have the exclusive right of taking up and disposing of the same, and of using such place so designated and inclosed, for the purpose of planting oysters therein," which right shall be transferable by written assignment in the manner specified, "*provided,* that nothing in this act contained, shall affect the rights of any owner or proprietor of any meadow or other lands, in which there may be salt-water creeks or inlets, or which may be opposite or

contiguous to such navigable waters; nor be construed to interfere with the existing by-laws of any city, town, or borough," or infringe the free navigation of the waters or interfere with the drawing seines in any place established and customarily used for seine fishing. The gathering or taking away of oysters from grounds so designated, without the permission of the owner, is rendered punishable by § 5. The foregoing provisions, with only minor changes not material to the present inquiry, have since continued in effect, and are §§ 3289, 3293, 3303, and 3277 of the General Statutes. Section 7 of the Act of 1855 (now § 3299) prescribed the fees of the committee at $1 per day for each member for the time actually occupied in making any designation and fifty cents for each description of such designation, to be paid by the applicant. There was included, in 1866, in the successor to § 2 of the 1855 Act (now § 3293) a provision that the money derived from such designation shall be paid to the town, but we do not find in the statutes or the record any requirement or evidence of any consideration paid to the town or required for any such designation. In 1882 an Act (now § 3304) was first passed providing that shell-fish grounds shall be taxed "in the same manner" as real estate "and no other tax or rental shall be laid or collected on such grounds or the franchise of any person therein."

The writing originally issued by the committee to a successful applicant merely "designated the following described place . . . as a suitable place to be used by said applicant for the planting of oysters, in accordance with the provisions of the Act of 1855."

The extent and limits of the rights conveyed by such a designation necessarily depend upon the legislative will and intent as manifested by the Act authorizing it. *Enfield Toll Bridge Co.* v. *Hartford & N. H.*

*R. Co.,* 17 Conn. 40, 55. Grants in derogation of the common or public right are to be strictly construed against the grantee. Nothing passes except what is granted specifically or by necessary implication. "As the State acts for the public good, we should expect to find the grant consistent with . . . the general welfare of the State at large and of the particular community to be affected." *Illinois Central R. Co.* v. *Illinois,* 146 U. S. 387, 468, 13 Sup. Ct. 110. Construing the designations here in question with due regard to these considerations it appears that, equally as was held in the *Darling* case as to leases under the Virginia oyster law, they were made only for the purpose of planting or cultivating oysters on the place specified. "It is for this purpose alone that the planter is authorized to use and occupy such ground—that is to say, that while any citizen might have taken oysters therefrom before the grant, afterwards he only may do so and all others are excluded from either planting or taking oysters from such ground during his term; this marks the limit of his right, for there is nothing to indicate that any other public or private right is withdrawn, limited or curtailed. He does not take a fee simple title, nor can he use the property for any other purpose except for that stated in the statute, and hence every other right theretofore in the public is preserved." 123 Va. 18, 19, 96 S. E. 307.

It follows, as stated subsequently by the United States Supreme Court in that case, that, as the trial court held, the recipients of the designations and the plaintiff as their successor in interest, took the same subject to such rights as existed to discharge sewage into the waters of Norwalk river and harbor, and to the risk of the pollution of the water naturally resulting therefrom. See quotation, *supra,* from *Darling* v. *Newport News,* page 543 of 249 U. S., 39 Sup. Ct. 372.

The foregoing considerations and decisions are decisive, also, of the appellant's further claim of an unconstitutional taking of his property without compensation. The issues do not require or warrant determination as to whether the General Assembly, in situations deemed by it to necessitate or justify such action, might prohibit or restrict the discharge of raw sewage into navigable waters, and thereby measurably curtail pollution resulting from such discharge, with consequential relief to holders of oyster grounds in such waters, or more directly afford such relief by legislation directed against injurious pollution of waters over such grounds, in like manner as the dumping of mud or other materials therein is prohibited under § 3276 of the General Statutes. The quotations, *supra*, from *Hampton* v. *Watson* and *Marcus Sayre Co.* v. *Newark*, appear to recognize that the State has control of the extent to which such waters may be used for sewage disposal, and that, at least when such use creates a public nuisance, it may be discontinued by legislative action.

There is no error.

In this opinion MALTBIE and BANKS, Js., concurred; WHEELER, C. J., and HAINES, J., dissented.