[Civil No. 2757.   Filed January 17, 1929.]

[273 Pac. 721.]

LEVI S. UDALL and LOUISA L. UDALL, Plaintiffs, v. THE STATE LOAN BOARD OF ARIZONA; J. C. CALLAGHAN, Treasurer; GEORGE W. P. HUNT, Governor of the State of Arizona; JAMES H. KERBY, Secretary of the State of Arizona, and J. C. CALLAGHAN, Treasurer of the State of Arizona, as Members of the State Loan Board of Arizona, Defendants.

See States, 36 Cyc., p. 885, n. 47.

Mr. Isaac Barth and Mr. Gilbert E. Greer, for Plaintiffs.

Mr. John W. Murphy, Attorney General, for Defendants.

McALISTER, J.—This is an original proceeding in which the plaintiffs, Levi S. Udall and Louisa L. Udall, his wife, are asking for an order directing the treasurer of the state of Arizona to accept the sum of $728.39 in full payment of their note to the state of

Arizona for $1,050 and to command G. W. P. Hunt, Governor, James H. Kerby, Secretary of State, and J. C. Callaghan, Treasurer, as members of the State Loan Board, to execute and deliver to them a satisfaction of the mortgage securing the said note, and to reassign and deliver to them the certificate of thirty shares of stock of the Lyman Water Company.

The case is presented upon an agreed statement of facts, the material portions of which follow. On the Little Colorado River in Apache County, Arizona, was located in 1916 and prior thereto a dam which impounded water for the irrigation of several thousand acres of land belonging to different individuals. This dam was washed out during that year by floods, and afterwards the various land owners who had been using the waters impounded by it for irrigating their lands, including the plaintiffs or their predecessors in interest, requested the State Treasurer, the Secretary of State, and the Governor, who compose the State Loan Board, to aid them in rebuilding it, and these officers loaned these land owners $120,000, and secured its repayment by taking mortgages from the owner of each tract of land to be irrigated thereby, and the money was used to reconstruct the dam and improve and construct the canals and laterals necessary to put the land under cultivation. None of it, however, was paid directly to the several persons to whom it had been loaned, but the state treasurer, through their written authorization, turned it over to, or upon the order of, the Lyman Water Company, a corporation, which then held title to the dam and reservoir sites, and had agreed to rebuild them. This company began construction and carried it on under the supervision and direction of an engineer appointed by the Governor of the state, but whose salary it itself paid.

After work on the dam had proceeded for some time, a change in the supervising engineer was made by the Governor, and the succeeding engineer thought that certain portions of the work had not been carried on properly, but should be torn out and reconstructed, and that it would be necessary to raise additional funds to complete the dam. Thereupon the land owners applied for additional and new loans on their several tracts of land, and these secured by mortgages on these lands were made, the original notes and mortgages being released and discharged. As before, they each gave the state treasurer written authority to pay the money loaned them to the Lyman Water Company to be used in reconstructing the dam.

After the work of rebuilding had continued for some time under the second supervising engineer, a third one was appointed, and he determined that certain portions of the previous construction should be torn out and new work put in, and that still additional funds would be necessary to complete the dam. Thereafter other lands were taken into the project, and new and additional loans secured by the lands thereunder, new notes bearing six per cent interest, and new mortgages being executed by the various land owners, including the plaintiffs. As before, those procuring loans gave the state treasurer written authority to pay the whole of their loans to the Lyman Water Company to be used in completing the dam. However, the understanding at the time each person procured his loan was that the proceeds thereof would be paid out by the state treasurer in satisfaction of bills approved and incurred by the Lyman Water Company in constructing the dam, canals, and other parts incident to the irrigation of said land, and not to the company directly, and, with the exception of $20,000 expended in 1926 for delinquent taxes and

assessments, the proceeds of said loan were so disbursed.

It was also understood and agreed between the persons procuring said loans and the state treasurer that the latter should be and remain a member of the board of directors of the Lyman Water Company.

The plaintiffs were the owners of thirty acres of farm land under the Lyman dam, and, upon representation of the state of Arizona, through its officers and agents, that the state would expend for their use and benefit the sum of $1,050 in the reconstruction of the dam, the ditches, and laterals, they executed to the state in 1920 for this sum a promissory note bearing six per cent interest and maturing fifteen years later, and secured its repayment by a mortgage upon this thirty acres of land and thirty shares of the capital stock of the Lyman Water Company which they transferred to the state loan board and authorized any one of its members to vote by delivering therewith their proxy thereto.

The funds in question were derived from the sale and rental of institutional lands granted to the state by the Enabling Act, and were loaned pursuant to sections 108 to 116, chapter 5, Second Special Session, of the second legislature.

In 1927 the plaintiffs and other owners of land under the Lyman Dam Project represented to the legislature that they had executed to the state of Arizona notes secured by mortgages for sums greatly in excess of the amounts expended by the state for their use and benefit, in that the sums spent in the construction of the dam, ditches, and laterals above described did not equal one-third of the amounts of their notes and mortgages to the state, and asked it to relieve them from paying the portion they did not receive. The legislature, after investigating the proposition, evidently felt that their cause was just, and,

to give effect to this conviction, enacted chapter 40, Session Laws of the Regular Session of that year, which is in the following language:

"An Act to compromise and settle the claims of Martin Jensen [and fifty-seven other named persons] and to recognize the liability of the State of Arizona in the expenditure of permanent school funds intended to be loaned to the settlers under the Lyman Dam, Apache County, Arizona; making an appropriation therefor and further providing for the ascertainment and report by the Loan Commission of the loss the State of Arizona has suffered on moneys loaned on land under the Lyman Dam Project.

"Be it enacted by the Legislature of the State of Arizona:

"Section 1. The Loan Commission of the State of Arizona is hereby authorized and directed to settle certain claims against the State of Arizona made by settlers under the Lyman Dam, by reducing certain loans now outstanding and held by the Loan Commission and secured by real estate mortgages, by amounts equal to fifty per cent. of the original moneys loaned; said amount deducted and the names of the persons entitled to relief are as follows:

| Number | Name | Amount | Acres Mtg. | Shares Pledged | Per Cent. Charged off |
|---|---|---|---|---|---|
| . . . . . . . . | . . . . . . . . . . . . . . . . . | . . . . . . . . . . . | . . . . . . . . | . . . . . . . . | . . . . . . . . . . . |
| 583 | Levi S. Udall | $1,050.00 | 30 | 30 | $525.00 |
| . . . . . . . | . . . . . . . . . . . . . . . . . | . . . . . . . . . . . | . . . . . . . . | . . . . . . . . | . . . . . . . . . . . |

Section 2 appropriates from the general fund the sum of $93,734.83, the total amount deducted from the sums due by the fifty-eight persons named, to be paid into the permanent school fund, or into the fund from which the loans were made, at the rate of $10,000 per year until such funds have been re-established. The last section, 3, is not material to this inquiry.

Following the passage of this chapter, plaintiffs offered the state treasurer $728.39, one-half of $1,050 plus the interest, in payment of their note, and de-

manded satisfaction of the mortgage and reassignment of the thirty shares of the capital stock of the Lyman Water Company, but, notwithstanding the foregoing direction of the legislature, that officer refused and still refuses to accept less than the full amount of the note, together with interest, in satisfaction thereof, or to reassign the capital stock. His refusal, as disclosed by the demurrer and answer, is based upon his belief that chapter 40 is unconstitutional and void in that it contravenes, among others, section 7, article 9, of the state Constitution, providing that "neither the State, nor any county, city, town, municipality, or other subdivision of the State shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise to any individual, association, or corporation."

Plaintiffs, upon the other hand, contend that this chapter does not constitute a donation or grant of the state's funds, but is merely a compromise and settlement of claims against the state, and, hence, within constitutional limits. This position is based upon the ground that it appears from the agreed statement of facts that the state agreed to and did undertake to expend for them and the other land owners under the dam the proceeds of its loans to them, and that, in carrying out this undertaking, it spent less than one-half of these funds for their use and benefit. The statement of facts, however, does not say what proportion was not properly expended, except as a part of the representations made by the land owners to the members of the legislature in their effort to secure relief legislation, but it does appear therein that the engineer appointed by the Governor to supervise the construction work was changed twice, and that in each instance the succeeding engineer tore out and rebuilt certain portions of the work of his prede-

cessor, and, according to the oral argument, this resulted in wasting a large percentage of the proceeds of their loans, and obligated the state morally and equitably to relieve them from payment to this extent. It is not contended that the state is legally bound to accept less than the face value of the notes, but merely that the proceeds thereof were spent by it in such a way that it created an obligation, founded upon equity and good morals, to do so, and, hence, that this had the effect of empowering the legislature to recognize the claims in question without violating the constitutional provision against donations or grants.

If the state were bound, even morally and equitably, to relieve the plaintiffs and others similarly situated in the manner sought, the enactment of chapter 40 was within the power of the legislature, and should be upheld, *Fairfield* v. *Huntington,* 23 Ariz. 528, 22 A. L. R. 1438, 205 Pac. 814, but, if the acts of the officers in question did not so obligate the state, the constitutional provision prohibiting donations is a barrier which the legislature could not surmount, however generous its motive may have been, because the worthiness of a claim alone, be it ever so great, is never sufficient to authorize the granting of state funds to "any individual, association, or corporation." *Fairfield* v. *Huntington, supra.*

The inquiry, therefore, narrows itself to the question whether under the agreed statement of facts there arose a moral obligation on the part of the state to relieve the plaintiffs and other land owners under the Lyman Dam from paying one-half of the face value of their notes. The correctness of the contention that it did, based upon the claim that the state itself agreed to and did supervise the rebuilding of the dam, depends upon the authority under which the officers composing the state loan board acted in

superintending the work for which the money loaned was to be expended. In no view of the situation could these acts be binding upon the state, unless they were performed pursuant to some statute or general provision of law, because the voluntary acts of a public officer cannot obligate the state even morally. This specific statement was made in *Duke* v. *Yavapai County*, 24 Ariz. 567, 211 Pac. 862, in which the purchaser of cattle at a tax sale claimed that in buying he relied upon the statements of certain county officers that the county would guarantee the title to the cattle to whomsoever purchased them, and in holding that these could not avail him, even though he did act upon them, the following language was used:

"These statements were voluntary, having been made in the absence of any statute authorizing them, and if they were the moving cause of appellant's purchase of the cattle any moral obligation to return the tax created thereby did not rest upon the county, but upon those who made them, or upon the owner of the cattle who took them from him, because the county could not be held responsible, either legally or morally, for the unauthorized statements of its officers."

If the loans in question had been made under sections 108 to 116, chapter 5, Session Laws of the Second Special Session of the second legislature, as they stood originally, it is clear that the acts of the loan board in supervising the work and paying out the money as it did would have been unauthorized, because the law then provided that the mortgages on which funds derived from institutional and school lands could be invested must be on cultivated lands. However, this provision of the land code, section 111, was amended by chapter 12 of the Session Laws of 1917 so as to provide as follows:

"No loan shall be made upon lands without the State of Arizona, nor on lands of which the appraised value is less than ten dollars per acre, and when

loans are made on unimproved farm lands they shall be conditioned upon the entire amount loaned being employed, under regulations to be adopted by the Governor, Secretary of State and State Treasurer, in the improvement of the lands forming the basis of security.''

It is clear that following this amendment the board was authorized to loan the funds in question on unimproved lands, but it could do so only upon condition that the entire amount loaned should be used to improve the lands forming the basis of the security, and, to guarantee that it would be spent for this purpose and none other, the Governor, Secretary of State, and State Treasurer were required to adopt suitable regulations. Hence, in agreeing to supervise the rebuilding of the Lyman dam and in carrying out this promise, the loan board was acting pursuant to statute, and, it appearing from the agreed statement of facts that a large percentage of the money loaned plaintiffs and others was, through the acts of some of the engineers supervising the work, spent wholly without benefit to the makers of the notes and, therefore, wasted, we think a moral obligation, at least on the part of the state, to relieve them from the payment of this proportion of the proceeds thereof arose, and that the effect of this action was to empower the legislature to recognize such obligation without contravening the constitutional provision against donations or grants.

We held, it is true, in *Rowlands* v. *State Loan Board*, 24 Ariz. 116, 207 Pac. 359, that the legislature could not, upon the ground that the mortgagors were unable to pay, forgive the interest on these loans over a certain period of time, because to do so would constitute a donation, a gratuity pure and simple. And there can be no question but that this holding was correct, since it is clear that the mere inability to meet one's debts could not create an obligation of any

kind on the part of the state to relieve them from doing so. But an entirely different situation presents itself here. The land owners in question were unable to build the dam without aid from some source, and the loan board, in order to help them in a most worthy undertaking, loaned them the money, and took mortgages upon their lands to secure its payment and to guarantee that it would be spent to improve the security for it, as provided in the amendment of section 111, *supra*, that is, in rebuilding the dam, and for nothing else, promised to and did supervise the work of construction. It was with this understanding that the notes and mortgages were executed, and naturally the land owners relied upon the board's spending the proceeds thereof for their benefit, and, if any part thereof, as a result of incompetent engineering skill, over which they had no control, was not so expended, the conclusion, it occurs to us, is inescapable that the state became morally obligated to relieve them from payment to this extent.

No one can say that under these facts there did not arise in favor of the plaintiffs and other land owners a claim founded in justice and equity at least (as much so in fact as the one in favor of Huntington in *Fairfield* v. *Huntington, supra,* who was injured in the service of the state and compensated by it in a special relief measure), and, whenever this is true, the legislature has the power to grant relief without rendering its act subject to the charge that it donates or gives away the state's money. As said in *McSurely* v. *McGrew,* 140 Iowa 163, 132 Am. St. Rep. 248, 118 N. W. 415:

"The legislature is not confined in its appropriation of public moneys, or of the sums to be raised by taxation, in favor of individuals, to cases in which a legal demand exists against the State, but the State can recognize claims founded in justice and equity."

In *State* v. *Carter*, 30 Wyo. 22, 28 A. L. R. 1089, 215 Pac. 477, paragraph 6 of the syllabus is in this language:

"Though in a sense every payment not legally enforceable might be said to be a gift, the constitutional prohibition against donations to individuals is not construed so broadly as that, but permits the state to discharge a moral obligation against it based on equity and justice, even though the claim be not legally enforceable."

It follows, therefore, that the legislature acted within its constitutional power in passing chapter 40, *supra,* hence it is ordered that the alternative writ heretofore granted be made peremptory.

LOCKWOOD, C. J., and ROSS, J., concur.