837 P.2d 158

ARIZONA CENTER FOR LAW IN the PUBLIC INTEREST, a nonprofit corporation; Defenders of Wildlife, a nonprofit corporation; Michael Gregory; Thomas Wright, and James Vaaler, Plaintiffs–Appellants,

v.

Milo J. HASSELL, in his capacity as State Land Commissioner; Arizona State Land Department, an agency of the State of Arizona, and State of Arizona, Defendants–Appellees,

Calmat Co. of Arizona, an Arizona corporation; Tanner Land Company, Inc., an Arizona corporation; Thomas M. and Frances K. Valente, husband and wife; First American Title Insurance Company of Arizona, an Arizona corporation; Maricopa County, a political subdivision of Arizona; Salt River Project Agricultural Improvement District, a political subdivision of Arizona, Defendants Intervenors–Appellees.

No. 1 CA–CV 89–134.

Court of Appeals of Arizona, Division 1, Department B.

Sept. 10, 1991.

Reconsideration Denied Jan. 22, 1992.

Joint Motion for Dismissal Granted; Review Dismissed Oct. 6, 1992.

Arizona Center for Law in Public Interest by David S. Baron, Tucson, and Arizona State University College of Law by Douglas A. Blaze, Tempe, for plaintiffs-appellants.

Perry, Pierson & Kolsrud by Russell A. Kolsrud and Renee B. Gerstman, Phoenix, for defendants-appellees.

Snell & Wilmer by Robert B. Hoffman and Bruce P. White, Phoenix, for defendants intervenors-appellees Calmat, Tanner, and Valente.

Helm & Kyle, Ltd. by John D. Helm, Tempe, for defendant intervenor-appellee Maricopa County.

Mariscal, Weeks, McIntyre & Friedlander by James T. Braselton and Donald McIntyre, Phoenix, for defendant intervenor-appellee First American Title.

Jennings, Strouss & Salmon by James Ackerman and M. Byron Lewis, Phoenix, for defendant intervenor-appellee Salt River Project.

Douglas B. Baily, Atty. Gen., State of Alaska, Jim Jones, Atty. Gen., State of Idaho, Brian McKay, Atty. Gen., State of Nev., Hal Stratton, Atty. Gen., State of N.M., Nicholas Spaeth, Atty. Gen., State of N.D., R. Paul Van Dam, Atty. Gen., State of Utah, Kenneth O. Eikenberry, Atty. Gen., State of Wash., John Hough, Sr. Asst. Atty. Gen., State of Wash., John K. Van de Kamp, Atty. Gen., State of Cal., and Jan Stevens, Supervising Deputy Atty. Gen., State of Cal., Sacramento, Cal., for amici curiae States of Alaska, California, Idaho, Nevada, New Mexico, North Dakota, Utah and Washington.

## OPINION

FIDEL, Presiding Judge.

In 1985, Arizona officials upset longstanding assumptions about title to riverbed lands by asserting that the state owned all lands in the beds of Arizona watercourses that were navigable when Arizona was admitted to the Union. The 38th Arizona Legislature responded by enacting 1987 Ariz.Sess.Laws, ch. 127 (H.B. 2017) (codified at Ariz.Rev.Stat.Ann. §§ 37-1101 to 37-1108, 12-510, and 12-529 (Supp. 1990)), substantially relinquishing the state's interest in such lands. The validity of that statute is the subject of this appeal.

## BACKGROUND

### A. *The Equal Footing Doctrine*

The state's claims originate in a common-law doctrine, dating back at least as far as Magna Charta, vesting title in the sovereign to lands affected by the ebb and flow of tides. *See Martin v. Waddell,* 41 U.S. (16 Pet.) 367, 412–13, 10 L.Ed. 997 (1842). The sovereign did not hold these lands for private usage, but as a "high prerogative trust ..., a public trust for the benefit of the whole community." *Id.* at 413. In the American Revolution, "when the people ... took into their own hands the powers of sovereignty, the prerogatives and regalities which before belonged either to the crown or the Parliament, became immediately and rightfully vested in the state." *Id.* at 416.

Although watercourse sovereignty ran with the tidewaters in England, an island country, in America the doctrine was extended to navigable inland watercourses as well. *See Barney v. Keokuk,* 94 U.S. 324, 24 L.Ed. 224 (1877); *Illinois Cent. R.R. v. Illinois,* 146 U.S. 387, 434, 13 S.Ct. 110, 111, 36 L.Ed. 1018 (1892). Moreover, by the "equal footing" doctrine, announced in *Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845), the Supreme Court attributed watercourse sovereignty to future, as well as then-existent, states. The Court reasoned that the United States government held lands under territorial navigable waters in trust for future states, which would accede to sovereignty on an "equal footing" with established states upon admission to the Union. *Id.* at 222–23, 229; *accord Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); *Land Department v. O'Toole,* 154 Ariz. 43, 44, 739 P.2d 1360, 1361 (App.1987).

The Supreme Court has grounded the states' watercourse sovereignty in the Constitution, observing that "[t]he shores of navigable waters, and the soils under them, were not granted by the Constitution to the United States, but were reserved to the states respectively." *Pollard's Lessee,* 44 U.S. (3 How.) at 230; *see also Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 374, 97 S.Ct.

582, 589, 50 L.Ed.2d 550 (1977) (states' "title to lands underlying navigable waters within [their] boundaries is conferred ... by the [United States] Constitution itself").

### B. *H.B. 2017*

Thus, on February 14, 1912, at the instant it achieved the constitutional status of a state, Arizona acquired title to the lands below high-water mark in all navigable watercourses within its boundaries. Until 1985, however, the Colorado River was the only watercourse in which the state asserted an equal footing claim. *See O'Toole*, 154 Ariz. at 46, 739 P.2d at 1363.

This changed in 1985, when state officials began, in lawsuits and in public comments, to assert state equal footing rights. *Id.* at 44, 739 P.2d at 1361. Existing title assumptions were threatened by these developments, and in 1987 the Arizona Legislature responded by enacting H.B. 2017, relinquishing the state's claims in large degree.[1] In the opening section of that statute, the legislature stated its purpose at some length. Describing the state's claims as vague, uncertain in location, and likely to cause "economic displacement," H.B. 2017, § 1(A), the legislature continued:

> The purpose of this act is to avoid a lengthy, difficult and expensive fact-finding effort and to resolve this state's

claim by recognizing the titleholders' accrued equity in taxes, improvements and family and social ties and confirming titles of private parties and political subdivisions to lands in the beds of waters other than the Colorado river and to compensate this state for relinquishing the claim in those areas where the state's claim may be more viable. Monies received by this state as compensation will be used to acquire riparian lands for public benefit. This act also provides for public recreational use of surface water in navigable watercourses.

H.B. 2017 § 1(B).

Only certain parts of H.B. 2017 are challenged in this lawsuit.[2] One of these constitutes an uncompensated quitclaim of the state's equal footing interest in all watercourses other than the Colorado, Gila, Salt, and Verde Rivers and in all lands formerly within those rivers but outside their current beds. *See* Ariz.Rev.Stat.Ann. §§ 37–1102(A) and 37–1102(B).

Another challenged part establishes a quitclaim fee of $25 per acre, for which any record titleholder of lands in or near the beds of the Gila, Salt, or Verde Rivers can obtain a quitclaim deed from the state land commissioner for all of the state's equal footing interest in such lands. *See* § 37–1103.[3]

---

1. A previous version of this statute, S.B. 1308, was enacted by the legislature in 1986, but was vetoed by Governor Bruce Babbitt, who described it in his veto message as an improper effort "to convey public assets to private parties."

2. Appellants challenge only H.B. 2017's enactment of Ariz.Rev.Stat.Ann. §§ 12–510, 12–529, 37–1102, 37–1103, and the first sentence of 37–1107. When we refer to H.B. 2017 in this opinion, we refer only to those portions of the act unless otherwise indicated.

3. The commissioner is required to deposit the $25 per acre quitclaim fee paid pursuant to Ariz.Rev.Stat.Ann. § 37–1103(E) in the "riparian acquisition trust fund" established under § 37–1108. This fund is to be maintained by the state treasurer, who may also accept other appropriations, gifts, grants, or donations to the fund. With the advice of the Arizona State Parks Board and the Arizona Game and Fish Commission, the State Land Commission is to use the income and other proceeds of the fund, but

none of the principal, "to acquire, from willing sellers, land or interests in land in riparian areas in this state for public purposes consistent with conservation of wildlife, flood protection and recreation." Ariz.Rev.Stat.Ann. § 37–1108(B).

Additionally, subject to certain significant exceptions and restrictions, § 37–1104(A) provides that "the public has the right to recreational use of surface waters between the current ordinary high water marks of a watercourse that was navigable as of February 14, 1912 without regard to the ownership of the bed." *But see* §§ 37–1104(B), (C), (D), (E) (providing for exceptions to the right of use in § 37–1104(A)).

Ariz.Rev.Stat.Ann. § 37–1104(C) provides that the public's right of recreational use of surface waters does not grant an easement or right to enter or cross private lands to use the surface waters for recreational uses. If, however, the waters are obstructed, one using the surface waters may "walk or portage around the obstruction in the least obtrusive manner possible" on the land. § 37–1104(C).

Another challenged part provides that every state land patent issued after the effective date of H.B. 2017 will convey any state equal footing interest in the patented land. *See* § 37–1107.[4] Another subjects the state's equal footing claims to statutory and equitable time bars from which the state was formerly exempt. *See* §§ 12–510 and 12–529.

The legislature declared the provisions of H.B. 2017 severable and enacted it as an emergency measure, effective immediately upon signing. Ariz.Const. art. IV, pt. 1, § 1(3). The bill was signed into law by Governor Evan Mecham on April 21, 1987.

## C. *Trial Court Proceedings*

Appellants Arizona Center for Law in the Public Interest, Michael Gregory, Thomas Wright, and James Vaaler commenced this lawsuit on July 28, 1987.[5] The complaint named State Land Commissioner Milo J. Hassell, the State Land Department, and the State of Arizona as defendants; several parties who claimed interests in riverbed lands intervened as additional defendants.[6]

Appellants, representing Arizona taxpayers and recreational users of Arizona riverbeds, claimed that H.B. 2017 violated the gift clause of the Arizona Constitution, Ariz.Const. art. IX, § 7; the special law clause of the Arizona Constitution, Ariz. Const. art. IV, pt. 2, §§ 19(6), 19(13), and 19(18); and the state's sovereign duty to protect the public trust. Appellants sought a declaratory judgment invalidating certain portions of the act, a declaratory judgment invalidating quitclaim deeds already issued pursuant to the act, and an injunction against issuance of further quitclaim deeds.[7]

These issues were submitted by cross-motions for summary judgment, and the trial court denied appellants' motion and granted summary judgment for the defendants and intervenor-defendants (collectively "appellees"). The trial court identified an issue of disputed fact—"whether the Salt, Gila and Verde Rivers were navigable on February 14, 1912"—but found no need to resolve that issue to decide the validity of H.B. 2017. Even if the rivers were navigable at statehood, the court reasoned, the state could legally relinquish its claims to the riverbeds for the purpose of "unclouding title."

The trial court awarded appellees their costs, denied their requests for attorneys' fees, and entered formal judgment in accordance with its rulings. During this appeal we accepted a brief *amicus curiae* filed by the Attorneys General of California, Nevada, Idaho, Washington, North Dakota, Utah, New Mexico, and Alaska, supporting the position of appellants, and we permitted appellees to file responding briefs.

## PRELIMINARY ISSUES

### A. *Public Purpose, Rational Classification, and Special Law Analysis*

 We first dispose of appellants' claim that H.B. 2017 violates the Arizona Constitution's prohibition against special laws. Article IV, pt. 2, § 19, of the Arizona Constitution provides in part:

> No local or special laws shall be enacted in any of the following cases, that is to say:
>
> ....
>
> 6. Limitation of civil actions or giving effect to informal or invalid deeds.
>
> ....

---

4. Section 37–1107 further provides that these patents do not affect the recreational rights of the public in surface waters pursuant to § 37–1104.

5. In September, 1987, appellants added Defenders of Wildlife, a nonprofit corporation, as a plaintiff.

6. Defendant-intervenors were: Calmat Co. of Arizona, Thomas and Frances Valente, Tanner Land Company, Inc., First American Title Insur-

ance Company of Arizona, Maricopa County, Flood Control District of Maricopa County, Salt River Project, and Salt River Valley Water Users' Association.

7. Appellants also alleged that H.B. 2017 violated the due process and equal protection clauses of the Arizona Constitution (Ariz.Const. art. II, §§ 4 and 13). Appellants have abandoned those claims on appeal.

13. Granting to any corporation, association, or individual, any special or exclusive privileges, immunities, or franchises.

....

18. Relinquishing any indebtedness, liability, or obligation to this State.

H.B. 2017 benefits the class of present and future record titleholders of land within Arizona riverbeds and streambeds other than the Colorado River. Although its benefits do not extend to other landholders within the state, that alone does not make H.B. 2017 an invalid special law. "To be general, a law need not operate on every person, place, or thing within the state...." *Republic Investment Fund I v. Town of Surprise*, 166 Ariz. 143, 150, 800 P.2d 1251, 1258 (1990). Three questions control: (1) whether the classification is rationally related to a legitimate legislative purpose; (2) whether the classification is sufficiently general to encompass all members similarly situated; and (3) whether the classification is sufficiently elastic to accommodate warranted inclusions and exclusions as circumstances change. *Id.* at 149, 800 P.2d at 1257 (approving test applied in *Petitioners for Deannexation v. City of Goodyear*, 160 Ariz. 467, 472, 773 P.2d 1026, 1031 (App.1989)).

We reject appellants' argument that H.B. 2017 serves no valid public purpose. The legislature was concerned, at least in part, with reliability and marketability of record title to substantial real property holdings throughout the state. The parties agree that over 40,000 parcels of land were potentially affected by the state's equal footing claims. So extensive an unsettling of record title is a valid subject of legislative concern. *See Opinion of the Justices*, 437 A.2d 597, 607 (Me.1981) ("[T]he clearing of title, so that commercial and other activity may go forward unimpaired by legal uncertainties, is a legitimate and important public purpose.").

We also reject appellants' argument that the beneficiary class of H.B. 2017 was arbitrarily defined. It is useful to compare the statute invalidated in *Republic Investment Fund I v. Town of Surprise*. There, the legislature was motivated by a legitimate

concern with the abusive municipal practice of "strip annexation." However, instead of extending the remedial option of deannexation to all areas where such abuses had occurred, the legislature restricted deannexation to a closed class of twelve cities within Maricopa County. Because this remedy lacked the requisite generality and elasticity, the statute was invalidated under Ariz.Const. art. IV, pt. 2, § 19. 166 Ariz. at 151, 800 P.2d at 1259. Here, by contrast, the requisite generality and elasticity are achieved; the beneficiary class encompasses not only all present but all future landholders within the affected watercourse areas. We find that the statute was tailored with sufficient generality and elasticity to rationally meet the legislature's concern.

Because H.B. 2017 meets the public purpose, generality, and elasticity requirement of Ariz.Const. art. IV, pt. 2, § 19, we find that it is not a special law.

### B. *Substantiality of Navigability Claim*

We have rejected appellants' argument that the legislature acted without public purpose when it attempted to cede to private owners the state's claims to watercourses other than the Colorado River. But we also reject appellees' effort to minimize the magnitude of this cession.

Throughout their briefs, appellees repeatedly dismiss the state's claims that rivers other than the Colorado were navigable at statehood as "uncertain," "doubtful," and "weak." They do so to establish for purposes of gift clause and public trust analysis that the legislature gave up nothing of substantial value.

We approach this argument, at this stage of proceedings, by examining whether appellants introduced substantial evidence to support their navigability claims. The standard of navigability for equal footing claims is established by federal law. *Utah v. United States*, 403 U.S. 9, 10, 91 S.Ct. 1775, 1776, 29 L.Ed.2d 279 (1971). Navigability is determined by reference to the ordinary and natural condition of the

watercourse at the time of the state's admission to the Union. *Id.*[8]

In *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870), the Supreme Court stated:

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

*Id.* at 563.

In *The Montello*, 87 U.S. (20 Wall.) 430, 22 L.Ed. 391 (1874), the Supreme Court emphasized that susceptibility to travel and trade would establish navigability, "no matter in what mode the commerce may be conducted." *Id.* at 441–42.[9] The Court acknowledged that "it is not ... every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable." *Id.* at 442. However, the Court continued,

> [T]here are but few of our fresh water rivers which did not originally present serious obstructions to an uninterrupted navigation. In some cases, ... they may be so great while they last as to prevent the use of the best instrumentalities for carrying on commerce, but the vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce. If this be so, the river is navigable in fact, although its navigation may be encompassed with difficulties by reason of

natural barriers, such as rapids and sandbars.

*Id.* at 443; *accord United States v. Holt State Bank*, 270 U.S. 49, 56, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926).

The Court has also indicated that the test of susceptibility to useful commerce does not require susceptibility to commercial activity on a large scale. In *Utah v. United States*, 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971), the Court examined historical evidence that the Great Salt Lake had been sporadically used by ranchers in the late nineteenth century to transport livestock between island and mainland. The Court deemed it irrelevant that "the business of the boats was ranching and not carrying water-borne freight" and that the carriage served only the few ranchers along the lake shores. *Id.* at 11, 91 S.Ct. at 1776. Because the lake was proven susceptible for usage "as a highway," the test of navigability was met. *Id.*

Mindful of this standard of navigability, we have examined the evidence that the parties submitted to the trial court. Although we need not detail this evidence in this opinion, it includes expert testimony, historical surveys, and news clippings from the relevant time. It is not our purpose to adjudicate on appeal the navigability at statehood of any particular Arizona river or stream. We conclude, however, that appellants submitted substantial evidence from which a factfinder might conclude that portions of rivers and streams other than the Colorado met the applicable standard of navigability at the time that Arizona became a state.[10]

---

**8.** The parties raise a related issue that we need not presently resolve: In deciding whether a watercourse, in its ordinary and natural condition at the time of statehood, would be susceptible to useful commerce, may the factfinder consider present modes of trade and travel, or is the factfinder limited to considering modes of trade and travel that were customary at the time of statehood? *See Alaska v. Ahtna*, 891 F.2d 1401, 1405 (9th Cir.1989) (present transportation methods may be considered), *cert. denied*, 495 U.S. 919, 110 S.Ct. 1949, 109 L.Ed.2d 312 (1990).

**9.** Although *The Daniel Ball* and *The Montello* were admiralty cases, the Supreme Court later

applied their definition of navigability in equal footing cases. *Utah v. United States*, 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971); *United States v. Oregon*, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267 (1935); *United States v. Holt State Bank*, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926).

**10.** The question whether a watercourse is navigable is one of fact. The burden of proof rests on the party asserting navigability unless the court takes judicial notice of the status of the watercourse. *Land Dep't v. O'Toole*, 154 Ariz. 43, 46 n. 2, 739 P.2d 1360, 1363 n. 2 (App.1987); *see Goosecreek Hunting Club, Inc. v. United States*, 207 Ct.Cl. 323, 518 F.2d 579, 583 (1975).

Appellees also argue, however, that because the state's equal footing claims were unproven when the legislature acted, these claims were too inchoate an asset to warrant gift clause or public trust analysis. Again we disagree.

It is true that Arizona has not yet proven that any parcel within the scope of H.B. 2017 lies within a watercourse that was navigable at statehood. Yet this does not mean that Arizona lacks an adjudicable interest in the lands that the legislature attempted to convey; nor does it mean that H.B. 2017 ceded nothing of public value. Arizona courts have recognized that even a contingent claim has value. *See In re Estate of Sullivan*, 51 Ariz. 483, 488, 78 P.2d 132, 134 (1938) (contingent indebtedness claim of bank had value); *Garrett v. Garrett*, 140 Ariz. 564, 567, 683 P.2d 1166, 1169 (App.1984) ("[An] attorney's contingency fee contract is a valuable property right, though the contingency upon which it is based has not been fulfilled."). And in this case there is nothing contingent about the state's claim. Arizona was invested with absolute title at statehood to a presently undefined quantity of riverbed land. *See Martin v. Waddell*, 41 U.S. (16 Pet.) at 410. This interest, though still uncertain in value and extent, is sufficiently substantial to warrant gift clause and public trust analysis.

## GIFT CLAUSE ANALYSIS AND THE PUBLIC TRUST

We now reach the dispositive gift clause and public trust issues. Although the parties have briefed these issues separately, we take them up together. Because the gift clause of the Arizona Constitution explicitly limits governmental freedom to dispose of public resources, it provides an appropriate framework for judicial review of an attempt by the legislative and executive branches to divest the state of a portion of its public trust.

### A. *The Public Trust Doctrine* [11]

■ An ancient doctrine of common law restricts the sovereign's ability to dispose of resources held in public trust.[12] This doctrine, integral to watercourse sovereignty, was explained by the Supreme Court in *Illinois Cent. R.R. v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). A state's title to lands under navigable waters

> is a title different in character from that which the State holds in lands intended for sale.... It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties.

*Id.* at 452, 13 S.Ct. at 118; *see also Martin v. Waddell*, 41 U.S. (16 Pet.) at 413 (describing watercourse sovereignty as "a public trust for the benefit of the whole community, to be freely used by all for navigation and fishery, as well for shellfish as floating fish").

In *Illinois Central*, the Supreme Court upheld the Illinois Legislature's repeal of an earlier legislative grant of land beneath Lake Michigan to the Illinois Central Railroad. The Court stated:

> The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property.... A grant of all the lands under the navigable waters of a State has never been adjudged to be

---

11. We take up only appellants' argument that the public trust doctrine restricts the state's ability to dispose of land under watercourses navigable at statehood. Although appellants also argue that the public trust doctrine should apply to the beds of streams that were not navigable at statehood, we need not reach that issue; H.B. 2017 relinquishes only title based on navigability as of February 14, 1912.

12. English common law distinguished two categories of property owned by the crown: *jus privatum* and *jus publicum*. The *jus privatum* was land, held by the sovereign, title to which the crown could transfer to private parties in fee simple. The *jus publicum* was land, principally that beneath watercourses subject to the ebb and flow of tides, which the crown held in trust for the public. *See Illinois Central*, 146 U.S. at 457–59, 13 S.Ct. at 119–21.

within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation.

146 U.S. at 453, 13 S.Ct. at 118.

The Court did not hold that equal footing lands were entirely inalienable. Rather, it stated:

> The control of the State for the purposes of the trust can never be lost, *except* as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.

*Id.* (emphasis added); *see also Appleby v. New York*, 271 U.S. 364, 384, 46 S.Ct. 569, 574, 70 L.Ed. 992 (1926) (upholding the New York Legislature's right to grant a deed in fee simple to approximately two blocks of land under tidal waters—the land to be improved by the grantee's filling, paving, and building bulkheads and wharves—"upon clear evidence of [the legislature's] intention and of the public interest in promotion of which it acted").

Whether an attempted disposition of public trust property meets such criteria is not determined pursuant to federal common law. Rather, as an attribute of federalism, each state must develop its own jurisprudence for the administration of the lands it holds in public trust. *Cf. Corvallis*, 429 U.S. at 376, 97 S.Ct. at 589 (The equal footing doctrine is not a source of federal common law. Although it operates to vest the state with sovereignty over certain watercourse land upon admission to the Union, thereafter, "the land is subject to the laws of the State.").[13]

**13.** Thirty-eight states—all that have considered the issue—have concluded that the state holds lands beneath navigable waterways in trust for the public. *See Mobile Transp. Co. v. City of Mobile*, 153 Ala. 409, 44 So. 976 (1907); *Anderson v. Reames*, 204 Ark. 216, 161 S.W.2d 957 (1942); *National Audubon Soc. v. Superior Court of Alpine County*, 33 Cal.3d 419, 658 P.2d 709, 189 Cal.Rptr. 346, *cert. denied*, 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983); *Lovejoy v. Norwalk*, 112 Conn. 199, 152 A. 210 (1930); *Coastal Petroleum Co. v. American Cyanamide Co.*, 492 So.2d 339 (Fla.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 950, 93 L.Ed.2d 999 (1987); *Robinson v. Ariyoshi*, 65 Haw. 641, 658 P.2d 287 (1982); *Kootenai Envtl. Alliance v. Panhandle Yacht Club*, 105 Idaho 622, 671 P.2d 1085 (1983); *People ex rel. Scott v. Chicago Park Dist.*, 66 Ill.2d 65, 4 Ill.Dec. 660, 360 N.E.2d 773 (1976); *State v. Sorenson*, 436 N.W.2d 358 (Iowa 1989); *Save Ourselves, Inc. v. Louisiana Envtl. Control Comm'n*, 452 So.2d 1152 (La.1984); *Opinion of the Justices*, 437 A.2d 597 (Me.1981); *Caine v. Cantrell*, 279 Md. 392, 369 A.2d 56 (1977); *Opinion of Justices to the Senate*, 383 Mass. 895, 424 N.E.2d 1092 (1981); *Bott v. Comm'n of Natural Resources*, 415 Mich. 45, 327 N.W.2d 838 (1982); *Nelson v. DeLong*, 213 Minn. 425, 7 N.W.2d 342 (1942); *Cinque Bambini Partnership v. Mississippi*, 491 So.2d 508 (Miss.1986), *aff'd sub nom. Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988); *State v. Bunkowski*, 88 Nev. 623, 503 P.2d 1231 (1972); *New Hampshire Water Resources Bd. v. Lebanon Sand & Gravel Co.*, 108 N.H. 254, 233 A.2d 828 (1967); *Lusardi v. Curtis Point Prop. Owners Ass'n*, 86 N.J. 217, 430 A.2d 881 (1981); *Coxe v. State of New York*, 144 N.Y. 396, 39 N.E. 400 (1895); *State ex rel. Rohrer v. Credle*, 322 N.C. 522, 369 S.E.2d 825 (1988); *United Plainsmen v. North Dakota State Water Conservation Comm'n*, 247 N.W.2d 457 (N.D. 1976); *Thomas v. Sanders*, 65 Ohio App.2d 5, 413 N.E.2d 1224 (1979); *Morse v. Oregon Div. of State Lands*, 285 Or. 197, 590 P.2d 709 (1979); *Alburger v. Philadelphia Elec. Co.*, 112 Pa. Commw. 441, 535 A.2d 729 (1988); *Jackvony v. Powel*, 67 R.I. 218, 21 A.2d 554 (1941); *Hobonny Club, Inc. v. McEachern*, 272 S.C. 392, 252 S.E.2d 133 (1979); *Hillebrand v. Knapp*, 65 S.D. 414, 274 N.W. 821 (1937); *State ex rel. Cates v. West Tennessee Land Co.*, 127 Tenn. 575, 158 S.W. 746 (1913); *Cameron County v. Velasquez*, 668 S.W.2d 776 (Tex.Ct.App.1984); *Colman v. Utah State Land Bd.*, 795 P.2d 622 (Utah 1990); *State v. Central Vermont Ry.*, 153 Vt. 337, 571 A.2d 1128 (1989), *cert. denied*, 495 U.S. 931, 110 S.Ct. 2171, 109 L.Ed.2d 501 (1990); *Darling v. City of Newport News*, 123 Va. 14, 96 S.E. 307 (1918), *aff'd*, 249 U.S. 540, 39 S.Ct. 371, 63 L.Ed. 759 (1919); *Caminiti v. Boyle*, 107 Wash.2d 662, 732 P.2d 989 (1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988); *Campbell, Brown & Co. v. Elkins*, 141 W.Va. 801, 93 S.E.2d 248 (1956); *Wisconsin's Envtl. Decade, Inc. v. Department of Natural Resources*, 85 Wis.2d 518, 271 N.W.2d 69 (1978). The doctrine is constitutionally or statutorily based in several jurisdictions. *See Owsichek v. Alaska Guide Licensing & Control Bd.*, 763 P.2d 488 (Alaska 1988); Alaska Const. art. VIII, § 3; Ind.Code Ann. § 13–2–11.1–2(b) (Burns 1990); *Galt v. Montana Dep't of Fish, Wildlife & Parks*, 225 Mont. 142, 731 P.2d 912 (1987); Mont.Const. art. IX, § 3. The Kansas Supreme Court has concluded that the doctrine does not apply to land beneath non-navigable waterways, but has not expressly stated whether the trust applies to land beneath navigable waterways in Kansas. *See State ex rel. Meek v. Hays*, 246 Kan. 99, 785 P.2d 1356 (1990).

### B. The Public Trust Doctrine in Arizona

Public trust jurisprudence is nascent in Arizona. Our supreme court long ago acknowledged the doctrine. *See Maricopa County Municipal Water Conservation Dist. No. 1 v. Southwest Cotton Co.*, 39 Ariz. 65, 73, 4 P.2d 369, 372 (1931) ("Navigable waters were, under the common law, considered as under the exclusive control of the government, in trust for the general public...."), *aff'd as modified*, 39 Ariz. 367, 7 P.2d 254 (1932). Yet the doctrine has not yet been applied.[14] Fortunately, however, to decide the public trust issues presented by this case, we need not weave a jurisprudence out of air. We develop our analysis along well-established lines.

■ Our first point of reference is *Illinois Central*, which the Supreme Court of Idaho described as "the seminal case on the scope of the public trust doctrine and [still] the primary authority today." *Kootenai Environmental Alliance, Inc. v. Panhandle Yacht Club, Inc.*, 105 Idaho 622, 625, 671 P.2d 1085, 1088 (1983). From *Illinois Central*, we derive the proposition that the state's responsibility to administer its watercourse lands for the public benefit is an inabrogable attribute of statehood itself. 146 U.S. at 453, 13 S.Ct. at 118 ("The state can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them ... than it can abdicate its police powers in the administration of government and the preservation of the peace."); *see also Kootenai*, 105 Idaho at 625, 671 P.2d at 1088 ("a state, as administrator of the trust in navigable waters on behalf of the public, does not have the power to abdicate its role as trustee in favor of private parties"); Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich.L.Rev. 471, 477 (1970)

(the state's trusteeship is an inalienable incident of sovereignty).

■ From *Illinois Central* we also derive the core proposition that the state must administer its interest in lands subject to the public trust consistently with trust purposes. *Illinois Central*, 146 U.S. at 453, 13 S.Ct. at 118; *see also Kootenai Envtl. Alliance*, 105 Idaho at 632, 671 P.2d at 1095 ("The public trust doctrine at all times forms the outer boundaries of permissible government action with respect to public trust resources.").

■ The second grounding for an Arizona law of public trust lies in our constitutional commitment to the checks and balances of a government of divided powers.[15] A leading Arizona constitutional scholar informs us that the delegates to the Arizona Constitutional Convention "understood and assumed the courts would exercise judicial review" and that they intended that function as "an additional check on legislative and executive abuse." Leshy, *The Making of the Arizona Constitution*, 20 Ariz.St. L.J. 1, 74, 75 (1988); *cf.* Ariz.Const. art. II, § 17 (courts must determine, when the legislature takes property under its eminent domain power, whether the public purpose declared by the legislature "be really public"). Indeed, the legislature itself recognized that H.B. 2017 would face judicial scrutiny. *See Ownership of Streambeds: Hearings on H.B. 2017 Before the Arizona Senate Committee on Natural Resources and Agriculture*, 38th Leg., 1st Sess. (Mar. 25, 1987) (minutes) (Representative Denny stated, "the intent of the bill [is] for the courts to determine in one lawsuit if the law is constitutional or not.").

Judicial review of public trust dispensations complements the concept of a public trust. Our supreme court said in reviewing a disposition of mineral deposits on school trust lands, "The duties imposed

---

14. This is surely attributable to the fact that the state has just begun to assert its equal footing rights. Had the state done so earlier, there would have been an earlier need to develop a law of public trust.

15. Ariz.Const. art. III provides: "The powers of the government of the State of Arizona shall be

divided into three separate departments, the Legislative, the Executive, and the Judicial; and, except as provided in this Constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others."

upon the state [are] the duties of a trustee and not simply the duties of a good business manager." *Kadish v. Arizona State Land Department,* 155 Ariz. 484, 487, 747 P.2d 1183, 1186 (1987), *aff'd,* 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). Just as private trustees are judicially accountable to their beneficiaries for dispositions of the res, *see Shriner's Hospitals for Crippled Children v. Gardiner,* 152 Ariz. 527, 528, 733 P.2d 1110, 1111 (1987), so the legislative and executive branches are judicially accountable for their dispositions of the public trust. The beneficiaries of the public trust are not just present generations but those to come. The check and balance of judicial review provides a level of protection against improvident dissipation of an irreplaceable res.[16]

The Supreme Court of Idaho described the interplay of the separate branches in public trust matters as follows:

> Final determination whether the alienation or impairment of a public trust resource violates the public trust doctrine will be made by the judiciary. This is not to say that this court will [substitute] its judgment for that of the legislature or agency. However, it does mean that this court will take a "close look" at the action to determine if it complies with the public trust doctrine and it will not act merely as a rubber stamp for agency or legislative action.

*Kootenai,* 105 Idaho at 629, 671 P.2d at 1092; *see also Opinion of the Justices,* 437 A.2d 597, 607 (Me.1981) (court will subject legislative dispensations of state natural resource holdings to a "high and demanding" standard of review).

C. *The Gift Clause as a Framework for Public Trust Review*

■ The third point of reference for development of public trust jurisprudence in Arizona is art. IX, § 7, of the Arizona Constitution:

Neither the State, nor any county, city, town, municipality, or other subdivision of the State shall ever ... make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation....

This provision, known as the gift clause, was adopted "to prevent governmental bodies from depleting the public treasury by giving advantages to special interests or by engaging in non-public enterprises." *Wistuber v. Paradise Valley Unified School District,* 141 Ariz. 346, 349, 687 P.2d 354, 357 (1984) (citations omitted). The framers did not restrict their prohibition to the grant of public money. They spoke of "any donation or grant, by subsidy or otherwise," and this court applied the gift clause to invalidate a lease of public property for token rental in *City of Tempe v. Pilot Properties, Inc.,* 22 Ariz.App. 356, 527 P.2d 515 (1974).

In *Wistuber,* the supreme court drew on our analysis in *Pilot Properties* to outline two elements of judicial review under art. IX, § 7: First, the reviewing court must be satisfied that a dispensation of public funds or property serves a public purpose. Second, the reviewing court must be satisfied that the dispensing public entity has received " 'consideration' which is not 'so inequitable and unreasonable that it amounts to an abuse of discretion,' thus providing a subsidy to the private entity." 141 Ariz. at 349, 687 P.2d at 357 (quoting *Pilot Properties,* 22 Ariz.App. at 363, 527 P.2d at 522).

In reviewing these questions, the supreme court cautioned, "the courts must not be overly technical and must give appropriate deference to the findings of the governmental body." *Id.* However, it also made clear that a reviewing court must be independently satisfied that the two elements of a valid dispensation have been shown:

> Of course, either objective may be violated by a transaction even though that

---

**16.** In a recent executive order establishing riparian area policy for Arizona, Governor Rose Mofford observed "that over 90% of the native riparian areas along our major desert watercourses has been lost, altered, or degraded; and it is recognized that past changes in these areas, particularly the alteration and loss of the State's surface water flows, have been detrimental to Arizona's riparian areas." Arizona Executive Order 91-6, 1991 Ariz.Legis.Serv. no. 2, at A-7, A-8.

transaction has surface indicia of public purpose. The reality of the transaction both in terms of purpose and consideration must be considered.

A panoptic view of the facts of each transaction is required.

*Id.*

The gift clause offers a well-established constitutional framework for judicial review of an attempted legislative transfer of a portion of the public trust. We hold that when a court reviews a dispensation of public trust property, as when a court reviews the dispensation of any other property, the two *Wistuber* elements—public purpose and fair consideration—must be shown. The gift clause surely requires no less for public trust property than for other holdings of the state.[17]

Yet public trust land is not like other property. As the Supreme Court said in *Illinois Central,* a state's title to lands under navigable waters is "different in character from that which the state holds in lands intended for sale." 146 U.S. at 452, 13 S.Ct. at 118. The state might sell ordinary property for fair consideration for the public purpose of enhancing the state fisc. Such a showing, however, would not suffice to validate a dispensation from the public trust. Because the state may not dispose of trust resources except for purposes consistent with the public's right of use and enjoyment of those resources, any public trust dispensation must also satisfy the state's special obligation to maintain the trust for the use and enjoyment of present and future generations.

The United States Supreme Court recognized in *Illinois Central* that some trust dispensations may not impair and, indeed, may even enhance public use and enjoyment. *Id.* at 452–53, 13 S.Ct. at 118. The Supreme Judicial Court of Massachusetts has also recognized that land once invested with the public trust may have undergone such changes over time that it is no longer suitable for public trust purposes. *Opinion of the Justices to the Senate,* 383 Mass. 895, 910, 424 N.E.2d 1092, 1103 (1981).

We will not attempt in this opinion to define the full range of riparian considerations that bear on the decision whether a given parcel retains public trust validity or whether a given dispensation meets the state's obligation to maintain the trust. However, in *Kootenai,* the Idaho Supreme Court has provided a useful partial listing of factors pertinent to this point:

[T]he court will examine, among other things, such factors as the degree of effect of the project on public trust uses, navigation, fishing, recreation and commerce; the impact of the individual project on the public trust resource; the impact of the individual project when examined cumulatively with existing impediments to full use of the public trust resource ...; the impact of the project on the public trust resource when that resource is examined in light of the primary purpose for which the resource is suited, *i.e.* commerce, navigation, fishing or recreation; and the degree to which

---

**17.** Appellees argue that a recent decision by Division Two of this court cedes unreviewable authority to the legislature to determine whether a public trust dispersal meets a valid public purpose. *See Seven Springs Ranch v. Arizona Dep't of Water Resources,* 156 Ariz. 471, 753 P.2d 161 (App.1987). We do not read *Seven Springs Ranch* so broadly. It merely comments, without analysis, that the public trust doctrine is not an extra-statutory factor to be considered when drawing basin and sub-basin boundaries under the Arizona groundwater code. *See id.* at 475–76, 753 P.2d at 165–66. The opinion nowhere addresses the question whether the legislature has unreviewable authority to determine that a valid public purpose is satisfied by disposition of a resource subject to the public trust.

In gift clause cases, the Arizona courts have recognized their obligation to make an independent determination that a public purpose has been met. *See generally Wistuber,* 141 Ariz. 346, 687 P.2d 354; *Pilot Properties,* 22 Ariz.App. 356, 527 P.2d 515. Similarly, in *Petitioners for Deannexation v. City of Goodyear,* 160 Ariz. 467, 773 P.2d 1026 (App.1989), *approved, Republic Investment Fund I v. Town of Surprise,* 166 Ariz. 143, 150, 800 P.2d 1251, 1258 (1990), in the context of the special law provision of the Arizona Constitution, our court expressly rejected the argument that the legislature's determination of valid purpose was exempt from judicial review. 160 Ariz. at 469–70, 773 P.2d at 1028–29.

broad public uses are set aside in favor of more limited or private ones.

105 Idaho at 629–30, 671 P.2d at 1092–93.

We conclude that these factors are additional considerations in gift clause review when the property in question is within the public trust.

### D. *The Deficiencies of H.B. 2017*

We come to our analysis of H.B. 2017. We approach that statute, as our supreme court instructed in *Wistuber*, with deference to the legislature's findings, yet cognizant that we must not merely rubber-stamp the legislature's decision. *See Kootenai*, 105 Idaho at 629, 671 P.2d at 1092. We believe that the Supreme Court of Idaho captured in a phrase our constitutional responsibility when it said we must give public trust dispensations "a close look." *Id.*

We have already addressed the first element of public trust review—the question whether the statute was enacted for a valid public purpose. In the preliminary section of this opinion, while rejecting appellants' challenge under Ariz.Const. art. IV, pt. 2, § 19, we held that H.B. 2017 was enacted in response to a valid legislative concern with the unsettling of record title to extensive landholdings throughout the state.

A public purpose, however, does not alone remove a challenged transaction from the prohibition of the gift clause. There must also be consideration that is not "so inequitable or unreasonable that it amounts to an abuse of discretion." *Wistuber*, 141 Ariz. at 349, 687 P.2d at 357; *Pilot Properties*, 22 Ariz.App. at 363, 527 P.2d at 522.

■ Appellees argue that fair consideration for gift clause purposes is automatically established when, as here, in the course of a settlement or compromise, the legislature relinquishes a disputed claim. The case that appellees rely on, *Udall v. State Loan Board*, 35 Ariz. 1, 273 P. 721 (1929), does not support this proposition. There, our supreme court sustained an enactment partially forgiving certain debts that private parties owed the state. The court reasoned that the state owed a moral obligation to the obligors because the debts had been unreasonably expanded through the incompetence of state engineers. The court, however, did not place compromises beyond gift clause reach; it merely recognized that moral consideration may support a transfer. *Id.* at 11, 273 P. at 724–25; *see also Fund Manager v. Corbin*, 161 Ariz. 364, 365, 778 P.2d 1260, 1261 (1989) (approving retroactive statutory validation of payment for services already rendered to state agency). We conclude that the consideration underlying compromise transfers, like other transfers, is subject to review.

■ Appellees argue, however, that the challenged provisions of H.B. 2017 are indeed supported by an equitable obligation that the state incurred to record titleholders through its long neglect of equal footing claims. We disagree. The United States Supreme Court has recognized that there is no unfairness or immorality in a state's pursuit of ownership claims based on the equal footing doctrine, even claims that have lain dormant for decades. *See Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 482, 108 S.Ct. 791, 798, 98 L.Ed.2d 877 (1988) (State of Mississippi not precluded from asserting claims of ownership of non-navigable tidelands raised for first time since statehood in 1817). That generations of trustees have slept on public rights does not foreclose their successors from awakening.

Appellees alternatively urge that H.B. 2017 produces adequate consideration for the state by establishing quitclaim fees, assuring ongoing receipt of property taxes, creating statutory public rights of access, and avoiding litigation costs. These are benefits to be sure. Yet we cannot judge their adequacy for a reason that brings us to a central defect of H.B. 2017. Although the act attempts the wholesale relinquishment of Arizona's equal footing claims to riverbed lands, the legislature acted without particularized information, and established no mechanism to provide particularized information, to support even an estimate of the value of those claims.

We do not suggest that a full-blown judicial determination of historical navigability and present value must precede the relinquishment of any state claim to a particular parcel of riverbed land. An administrative process might reasonably permit the systematic investigation and evaluation of each of the state's claims. Under the present act, however, we cannot find that the gift clause requirement of equitable and reasonable consideration has been met.

We turn to what we have identified as an additional question in gift clause review of dispensations from the public trust: whether the dispensation satisfies the state's special obligation to maintain the trust for the use and enjoyment of present and future generations. Here we find the same deficiency identified above. The legislature established no basis to assess the value as a public resource of the parcels that it relinquished wholesale by its act.

This deficiency is highlighted by a Massachusetts case upon which appellees have relied. *Opinion of the Justices to the Senate*, 383 Mass. 895, 424 N.E.2d 1092 (1981). There the Supreme Judicial Court of Massachusetts acceded to a legislative determination that certain already-filled tidelands had no further value for public trust purposes and that the relinquishment of those lands would not impair the public trust.[18] For lands of potentially greater public value, however, the justices noted that the Massachusetts statute established an administrative process "for the exercise of individual judgments on a parcel by parcel basis, where both the public interest and the nature of the interests to be surrendered can be considered, all subject to judicial review." *Id.* at 911, 424 N.E.2d at 1103. No such process was established in H.B. 2017.

A second deficiency in our statute is also highlighted by review of the opinion of the Massachusetts Supreme Judicial Court. H.B. 2017 proclaims the public right—subject to certain restrictions concerning access—to recreational use of surface waters in any watercourses that were navigable at statehood. *See* Ariz.Rev.Stat.Ann. §§ 37–1104(A) and 37–1107. Yet it provides for relinquishment of all state "right, title and interest" in the underlying lands without providing means to prevent diversions, obstructions, or uses inconsistent with the public trust. *See* Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention,* 68 Mich. L.Rev. 471, 490 (1972) ("When a state holds a resource which is available for the free use of the general public, a court will look with considerable skepticism upon *any* governmental conduct which is calculated *either* to reallocate that resource to more restricted uses *or* to subject public uses to the self-interest of private parties.") (emphasis in original).

In the Massachusetts statute, by contrast, lands of potential public value were subjected to administrative screening whereunder

> [t]he secretary ... must determine whether the uses to which the record owner is putting or proposes to put his property "serves or will serve a *proper public purpose*" (emphasis supplied [by Massachusetts court]). He must find that the use or proposed use will not be detrimental to the public navigation of the remaining waters of the Commonwealth or the port of Boston or Boston Harbor. He may impose reasonable conditions, including the payment of reasonable compensation to the Commonwealth and a requirement that the public have access to the water.

*Id.* at 913, 424 N.E.2d at 1105. The Massachusetts court further noted that the secretary's decisions were subject to judicial review, including "a consideration of the reasonableness of any conditions imposed and the reasonableness of the absence, if any, of any conditions." *Id.*

Our purpose in elaborating on the Massachusetts statute is not to suggest its adop-

---

**18.** We similarly recognize that, when a particular parcel of riverbed land, though once invested with the public trust, is no longer suitable for public trust purposes, the state may divest itself of that parcel after appropriate legislative or administrative action.

tion in this state.[19] We do so only to demonstrate, by contrast, certain inadequacies in H.B. 2017. We find that H.B. 2017 fails to provide a mechanism for particularized assessment of (1) the validity of the equal footing claims that it relinquishes; (2) the continuing value of land subject to such claims for purposes consistent with the public trust; (3) equitable and reasonable consideration for claims that may be relinquished without impairing the public trust; and (4) conditions that may be necessary to any transfer to assure that public trust interests remain protected.

We find for all of these reasons that the challenged portions of H.B. 2017 [20] are invalid under the public trust doctrine and under article IX, § 7, of the Arizona Constitution.

### COSTS AND FEES

Because we reverse, we need not consider whether the trial court erred in awarding, as taxable costs to appellees, the deposition copy charges that they paid.

■ Appellants request an award of attorneys' fees against appellees for services performed on appeal and in the trial court under the private attorney general doctrine adopted in *Arnold v. Arizona Department of Health Services*, 160 Ariz. 593, 775 P.2d 521 (1989). Because we award fees pursuant to this doctrine, we need not consider appellants' alternative request for fees pursuant to Ariz.Rev.Stat.Ann. § 12–2030 (Supp.1990).

In *Arnold*, our supreme court defined the private attorney general doctrine as "an equitable rule which permits courts in their discretion to award attorney's fees to a party who has vindicated a right that: (1) benefits a large number of people; (2) requires private enforcement; and (3) is of societal importance." 160 Ariz. at 609, 775 P.2d at 537. Each of these criteria is met. The right that appellants have pressed belongs to the state itself. Its vindication

benefits large numbers of Arizonans and is of great societal importance. And because its vindication required a direct challenge to a statute adopted by the Arizona Legislature, the right could only have been privately enforced. In our discretion, we award appellants their reasonable attorneys' fees incurred in the trial court and on appeal.

■ We award these fees not only against the public entities among the appellees but also against the private appellees. Contrary to their argument, we do not find that the exclusive purpose of the private attorney general doctrine is to impose the cost of vindicating public rights on the public itself. Awarding attorneys' fees against private defendants in appropriate cases will promote important public rights to the same extent as awarding fees against governmental defendants. Moreover, we find no unfairness in requiring the intervenor-appellees to share with the state the burden of appellants' partial victory in this case. The intervenor-appellees came to the state's aid to promote interests of their own that were more specific and substantial than those of members of the general public. And as the record makes quite plain, their participation added significantly to the legal effort required to prosecute appellants' claims.

■ We also reject the assertion that appellants forfeited the right to attorneys' fees against the intervenor-appellees by failing to explicitly seek such fees in the trial court. Appellants' complaint sought a "judgment against the defendants" that encompassed five categories of relief, including attorneys' fees. The intervenor-appellees later sought and were granted intervention as "defendants." It would be hypertechnical and unjust to preclude appellants from recovering attorneys' fees that they have earned, merely for failure to amend their complaint to expressly include

---

19. The Massachusetts justices in their advisory opinion expressed reservations about some aspects of that statute, *id.* at 910, 917, 424 N.E.2d at 1102, 1107, and the Massachusetts Legislature ultimately chose a different approach. *See*

Mass.Gen.Laws Ann. ch. 91, §§ 1, 14, 15, 18 (Supp.1991) (providing for case-by-case approach to the problem).

20. *See supra* note 2.

the intervenor-appellees within their demand for judgment.

## CONCLUSION

We hold that H.B. 2017 violates the public trust doctrine and Ariz.Const. art. IX, § 7. We award appellants reasonable attorneys' fees against appellees and intervenor-appellees under the private attorney general doctrine for services rendered in the trial court and on appeal.

The trial court's judgment is reversed, and the matter is remanded with directions to enter judgment and an injunction in favor of appellants in accordance with this opinion.

JACOBSON and TAYLOR, JJ., concur.